**FIFTH THIRD BANK OF WESTERN OHIO, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–503C.

United States Court of Federal Claims.

Feb. 10, 2003.

Alan M. Grimaldi, Washington, DC, for plaintiff, with whom was Robert M. Bruskin, Timothy K. Armstrong, Alexander B. Berger, and Jennifer R. Bagosy. Tina Woods, Fifth Third Bank of Western Ohio, of counsel.

David A. Levitt, Washington, DC, for defendant, with whom was Deputy Assistant Attorney General Stuart E. Schiffer. Brian A. Mizoguchi, Jr., Jonathan S. Lawlor, John H. Roberson, and Gregory R. Firehock, of counsel.

## OPINION

MILLER, Judge.

Defendant has moved for summary judgment, *inter alia*,[1] with respect to all the

---

[1]. Defendant's Motion To Dismiss for Failure To State a Claim Upon Which Relief May Be Granted and Motion for Summary Judgment on Damages, filed Sept. 18, 2002, also addressed standing, which is subject to separate briefing and which the court rules on in a separate order issued this date.

damages claims in this *Winstar* case. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The issue that has commanded the most attention by the parties in briefing and arguing the motion is whether defendant has demonstrated that plaintiff has failed to raise a genuine issue of material fact that would entitle plaintiff to a trial on its claim for lost profits. Although similar claims have not been resolved on motions for summary judgment, this case, defendant insists, is the clear exception.

## FACTS

The facts in this case are discussed in this court's opinion on plaintiff's "Short–Form" Motion for Partial Summary Judgment on Liability and Defendant's Motion for Summary Judgment. *Fifth Third Bank of Western Ohio v. United States*, 52 Fed.Cl. 264 (2002) ("*Fifth Third I*"). The facts material to resolving this motion are undisputed, and those additional facts that are recited as background are stated with a presumption to plaintiff's formulation, although subject to further proof at trial.

Fifth Third Bank of Western Ohio ("plaintiff") is the successor-in-interest to claims originally brought by Citizens Federal Bank, FSB ("Citizens").[2] Between 1982 and 1985, under the auspices of a Government-sponsored assistance program, Citizens entered into six transactions with six failing thrifts in southern Ohio. In each transaction Citizens either acquired branch offices of the failing thrift or merged with the failing thrift.

The six transactions are, as follows:

1. The April 30, 1982 acquisition of 13 branch offices in Cincinnati of Cardinal Federal Savings and Loan Association ("Cardinal");

---

[2]. Citizens merged into plaintiff on August 14, 1998. Prior opinions refer to "Citizens" and "plaintiff" interchangeably because their separate identity was not integral to the issues addressed. This opinion distinguishes the two.

2. The March 1, 1983 acquisition of the Lebanon and Wilmington branch offices of Gateway Federal Savings and Loan Association ("Gateway");

3. The January 31, 1984 merger with Sentry Savings and Loan Company ("Sentry");[3]

4. The March 1, 1984 merger with Homestead Federal Savings and Loan Association ("Homestead");

5. The August 1, 1985 merger with First Federal Savings and Loan Association ("First Federal"); and

6. The August 5, 1985 acquisition of the Chillicothe branch office of Freedom Federal Savings and Loan Association.

For each transaction the marked-to-market value of the acquired thrifts' liabilities exceeded their assets, and Citizens designated the excess of the purchase price over the fair market value of identifiable assets as an intangible asset referred to as goodwill. *Fifth Third I* at 265.

Citizens recorded a total balance of goodwill of approximately $101 million arising from the six transactions between 1982 and 1985, of which approximately $66.4 million remained on Citizens' books as of March 31, 1990, following the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 ("FIRREA"). Report of Professor Christopher James (June 28, 2001) ("James Rpt."), Ex. F. (amortized "contractual goodwill" figure as of March 31, 1990); Report of Dr. R. Daniel Brumbaugh 19–20 (June 28, 2001) ("Brumbaugh Rpt."). Plaintiff notes that the amount of goodwill remaining as of December 31, 1989, was $67,659,432.00. James Rpt., Ex. BB.

Plaintiff alleges that Citizens' six transactions were induced, in part, by a perceived new government policy that encouraged healthy thrifts to merge or acquire failing thrifts in an effort to minimize the exposure of the Federal Savings and Loan Insurance Corporation, which insured the unhealthy thrifts. One of the principal inducements of such acquisitions, according to plaintiff, was the understanding on the part of many thrifts that they could take advantage of a particular type of accounting arrangement, whereby acquiring thrifts could meet their reserve capital requirements under federal regulations by using the "purchase method" of accounting. Under this method acquired assets and liabilities were revalued at their market values instead of book values, but the acquiring thrift was allowed to recognize the excess of the purchase price over the value of the net liabilities acquired as an intangible asset called "goodwill."

Citizens accounted for each of the six transactions using the purchase method, thereby amortizing goodwill and counting it towards the thrift's regulatory capital requirements. The asset in question came to be known as "supervisory goodwill" in the context of such "supervisory mergers."

Based on discussions with investment bankers and others, Citizens began to pursue initial steps to convert from mutual to stock form in 1986 and expected that it could raise $150 million in a conversion offering in the summer of 1986. Report of Ronald S. Riggins 9 (June 28, 2001) ("Riggins Rpt.").

In mid-October 1986, Citizens put its stock conversion plans on hold because the bank's management and the Board of Directors considered that market conditions had deteriorated and the Board considered remaining a mutual institution a good alternative. Riggins Rpt. 11.

In 1989 Congress passed FIRREA, which was signed into law on August 9, 1989. FIRREA created the Office of Thrift Supervision (the "OTS") and the Federal Deposit Insurance Corporation (the "FDIC"). FIRREA effectively eliminated the goodwill carried by Citizens for regulatory capital purposes.

Defendant characterizes Citizens' financial situation as deteriorating before the enactment of FIRREA, contending that Citizens had to sell branches, reduce non-interest expenses, convert to stock form, and begin reducing the risk in its loan portfolio in an

---

**3.** Although the Sentry merger was originally part of this case, the court, in *Fifth Third Bank of Western Ohio v. United States*, 52 Fed.Cl. 829, 836 (2002) (*"Fifth Third III"*), dismissed plaintiff's claims arising out of the acquisition of Sentry.

effort to avoid deterioration in net income before 1989. Plaintiff will seek to prove that FIRREA caused Citizens to convert to a mutual form in 1992, earlier than it otherwise would have, and influenced its decision to sell its Cincinnati division, consisting of 13 branches. Brumbaugh Rpt. 19–20. Plaintiff contends that the OTS and the FDIC repeatedly requested that Citizens accelerate its plans to raise regulatory capital to cure its capital deficiency, and that as a result of FIRREA, Citizens fell out of compliance with OTS and FDIC regulations because it lacked adequate capital reserves.

During November 1989 bank examiners with the OTS requested that Citizens submit a capital restoration plan and placed the bank under a growth restriction. Citizens filed a Business–Capital Restoration Plan on January 5, 1990. The OTS rejected this plan in May 1990 and required Citizens to sign a Consent To Merge and Operating Agreement, which restricted Citizens' operations. Citizens therefore revised its plan and resubmitted it to the OTS on June 15, 1990. The OTS again rejected the plan. Citizens submitted a third plan, which included two commitments: first, to sell its Cincinnati division, and second, to engage in a mutual-to-stock conversion in 1991. The OTS approved Citizens' plan on September 25, 1990.

After gaining regulatory approval in 1991, Citizens formed a holding company and commenced its conversion offering to the public on November 8, 1991. On January 29, 1992, before the OTS deadline of March 31, 1992, Citizens consummated its stock conversion, raising gross proceeds of approximately $36 million. The combination of shrinking in size and converting from mutual to stock form allowed Citizens to meet its fully phased-in capital requirement by the end of 1992. Brumbaugh Rpt. 21. Plaintiff maintains that the conversion was not necessary in early 1992 for Citizens to meet capital requirements then in effect. Brumbaugh Rpt. 21 n. 48.

In early 1993 Citizens determined that it needed to raise additional capital to be deemed a "well capitalized" institution pursuant to the Federal Deposit Insurance Corporation Improvement Act of 1991. Riggins Rpt. 35–36. Citizens proceeded to issue $40.25 million of subordinated notes in a transaction that was completed on August 19, 1993. Riggins Rpt. 36. Approximately $22 million of the proceeds of the subordinated debt offering were down-streamed to Citizens as additional capital. Brumbaugh Rpt., Ex. D–5d n. b. Plaintiff contends that the capital raised also was intended to facilitate the implementation of Citizens' business plan, which called for the resumption of the bank's growth and diversification. Riggins Rpt. 36.

Plaintiff will seek to prove that the Government breached the supervisory goodwill contracts because FIRREA and its implementing regulations repudiated the agreed-upon treatment of goodwill and effectively eliminated the use of goodwill as regulatory capital. The breach harmed Citizens by imposing new capital requirements that eliminated supervisory goodwill as a form of regulatory capital. Regulations implementing FIRREA forced Citizens to decrease the volume of its assets by selling its Cincinnati division and thereby constricting its business. The new regulations forced Citizens to consummate the stock conversion prematurely. Plaintiff argues that Citizens would not have converted in January 1992, but rather in mid–1993, at a time when Citizens could have enjoyed a more favorable return on the conversion. On August 4, 1995, Citizens filed a complaint in the United States Court of Federal Claims, seeking, *inter alia*, breach of contract damages arising out of the supervisory transactions.

Defendant now moves, pursuant to RCFC 56, for summary judgment with respect to plaintiff's damages claims, contending that the damages models upon which plaintiff relies do not conform to *Winstar* precedent and demonstrate neither the fact nor the amount of injury.

Plaintiff presents five alternative claims: two expectancy damages claims, one reliance damages claim, and two restitution claims. Plaintiff makes one additional claim for certain incidental damages.

*1. Expectancy damages—lost profits and related claims*

*1) Lost profits from loss of supervisory goodwill*

■ Expectancy damages measure the cost of restoring the non-breaching party to the position in which it would have been had the contract been performed. *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (2001) ("*Glendale*"); Restatement (Second) of Contracts § 344(a) (1981). Plaintiff charges that the Government's passage of FIRREA constitutes a breach of the goodwill contracts, such that the breach prevented Citizens from counting the supervisory goodwill towards its regulatory capital requirement. Plaintiff's expert Dr. R. Daniel Brumbaugh opines that, "[a]bsent the breach, [Citizens] would have been able to count the supervisory goodwill as regulatory capital and would not have suffered the asset shrinkage and reduced earnings that it actually did." Brumbaugh Rpt. 25. He assumes that the return on average asset would be lower than that of the actual bank's assets. Rebuttal Report of Dr. R. Daniel Brumbaugh ¶ 256 (Sept. 26, 2002) ("Brumbaugh Rebuttal"). Dr. Brumbaugh does not identify specific opportunities to "grow" that the actual bank could have taken advantage of. Deposition of Dr. R. Daniel Brumbaugh at 455 (Sept. 12, 2001) ("Brumbaugh Dep.").

To calculate lost profits, Dr. Brumbaugh first hypothesizes a "But-for Bank," which is the bank that would have existed absent FIRREA, with supervisory goodwill counted towards the But-for Bank's regulatory capital and with the Cincinnati division restored to it. Dr. Brumbaugh assumes, for his model, that the core capital ratio for the But-for Bank was the same as that of the actual bank. Brumbaugh Dep. at 412–13. Dr. Brumbaugh then calculates lost profits by projecting the return of those missing incremental assets that the But-for Bank would have earned. The projections are based on, but are lower than, Citizens' actual performance during the period between the breach and 1998, when Citizens was taken over by plaintiff. Brumbaugh Rebuttal ¶ 256. Dr. Brumbaugh's model calculates lost profits as the product of the incremental assets and the incremental return that the But-for Bank would have earned. He therefore calculates that lost profits from loss of supervisory goodwill approximates $25.927 million.

Defendant challenges the model of the But-for Bank that Dr. Brumbaugh devised for calculating lost profits. Defendant interprets Federal Circuit precedent in *California Federal Bank, FSB v. United States,* 245 F.3d 1342, 1350 (Fed.Cir.2001) ("*Cal Fed*"), to require a party seeking to prove lost profits to present evidence of actual assets and liabilities that it allegedly would have held in the absence of FIRREA and to trace the performance of those assets and liabilities after FIRREA.

Had FIRREA not intervened, Dr. Brumbaugh reasons, Citizens would have retained the Cincinnati division and performed the stock conversion at a later date. However, other than the Cincinnati division, plaintiff has not identified any particular assets that the bank would have held absent the passage of FIRREA. Defendant therefore faults Dr. Brumbaugh for not identifying any particular business opportunities that Citizens would have pursued had FIRREA not been passed. Dr. Brumbaugh's But-for Bank is deemed hypothetical: It is comprised of a mix of assets and liabilities similar to that held by the actual bank, which earn a return somewhat less than that earned by the actual bank. On this basis defendant argues that no genuine issue of material fact impedes summary judgment, and that *Cal Fed* calls for rejection of plaintiff's claim for lost profits on summary judgment.

*2) Reduced conversion proceeds*

Within plaintiff's expectancy claim, Dr. Brumbaugh includes damages arising from Citizens' forced mutual-to-stock conversion in January 1992. Plaintiff contends that Citizens would not have converted to stock form at that time and did so only due to FIRREA and the agency regulations. January 1992 was an economically inopportune time to undertake a stock conversion, because the effects of FIRREA and the on-going savings and loan crisis rendered thrifts unattractive investments. Plaintiff therefore contends

that Citizens raised far less capital than it could have had it been allowed to issue and sell stock at a time of its choosing.

Dr. Brumbaugh calculates lost conversion proceeds by determining: 1) when the But-for Bank would have made the conversion absent FIRREA; 2) what the proceeds of this delayed conversion would have been; and 3) the difference between the hypothetical conversion proceeds and the actual proceeds. Plaintiff presents the expert testimony of thrift appraiser and financial consultant Ronald S. Riggins to demonstrate the financial consequences of the forced conversion and to calculate the appraised value of the But-for Bank. *See generally* Riggins Rpt.

Mr. Riggins estimates that without the breach, Citizens would have deferred the stock conversion until the summer of 1993, at which point the conversion would have raised $95 million, a net increase of $58.35 million more than the amount raised by the actual conversion. *See generally* Riggins Rpt. ¶¶ 46–59; Rebuttal Report of Ronald S. Riggins ¶ 85 (Sept. 26, 2002) ("Riggins Rebuttal"). Therefore, plaintiff claims $58.35 million in reduced conversion proceeds.

Even assuming that conversion proceeds were reduced in the manner alleged by plaintiff, defendant argues that case law establishes that reduced conversion proceeds do not constitute expectancy damages to a thrift, because they do not affect the economic interest of the investors who participate in the conversion. Defendant asserts that stockholders in 1993, buying equitable shares at the deferred date, would either have paid more for their stock, or would have paid the same amount to purchase a smaller interest in the corporation.

Defendant also characterizes plaintiff's claim for reduced conversion proceeds as "double count[ing]" the lost profits claim. Def.'s Br. filed Sept. 18, 2002, at 22. According to defendant, the claim for reduced conversion proceeds attempts to recover the amount that Citizens would have earned if it could have levered goodwill by the amount that could have been realized, which would have resulted in investors' willingness to pay more for a share in the thrift. The purported double-counting results from plaintiff's

claim to lost profits for FIRREA's reduction of Citizens' regulatory capital, as well. Defendant states that claiming reduced conversion proceeds as a type of expectancy damages is "absurd," Def.'s Br. filed Nov. 18, 2002, at 12, because plaintiff is asserting the interest of the conversion stockholders, and the argument amounts to an illogical complaint that they paid too little for a thrift that was worth much more.

### 3) *Capital replacement costs*

The final component of plaintiff's expectancy damages claim is capital replacement costs, which account for lost profits from 1998–2008. This additional calculation is necessary because Dr. Brumbaugh calculates lost profits only through March 1998, the last full quarter prior to Citizens' acquisition by plaintiff. The cost-of-replacement-capital calculation, performed by Professor James, provides a surrogate for lost profits from 1998–2008, when the But–For Bank would have amortized fully the supervisory goodwill. *See generally* James Rpt. Because supervisory goodwill is a unique asset and cannot otherwise be modeled, Professor James uses preferred stock as a proxy for supervisory goodwill. Professor James's replacement cost model purports to estimate the cost that Citizens would have incurred had it raised cash to replace goodwill by issuing preferred stock. James Rpt. 42. The model assumes a cost of raising capital by issuing preferred stock beyond the cost of the offering (flotation or transaction cost) and that the cost consists of the dividend payments made to the preferred stockholders. *Id.* The model is adjusted to account for differences between preferred stock and supervisory goodwill. Based on this model, Professor James estimates that the net present cost of replacing the supervisory goodwill possessed by the But-for Bank as of June 1998 is $6.374 million. James Rpt. 47–49 & n. 155.

Plaintiff's model is flawed, defendant argues, because plaintiff would have been required first to convert from mutual to stock form before issuing preferred stock. Indeed, Professor James admits that "in the real world, only stock thrifts are allowed to issue preferred stock" and therefore "Citizens

would have to first convert from mutual to stock thrift via an initial public offering of common shares and then possibly issue additional preferred stock in a seasoned equity offering." James Rpt. 42 n. 132.

Moreover, defendant argues that even if the preferred stock model is appropriate, the cost of paying dividends to preferred stockholders should not be included in the cost of raising capital. The only cost of raising capital through preferred stock is the transaction cost of the issue. *See California Fed. Bank v. United States,* 43 Fed.Cl. 445, 459 (1999), *aff'd in part, vacated in part, and remanded,* 245 F.3d 1342 (dividend payments not cost of raising capital, but "flotation [transaction] costs provided an appropriate measure of [plaintiff's] damages to replace the supervisory goodwill with tangible capital"); *Glendale Fed. Bank v. United States,* 43 Fed.Cl. 390, 401–02 (1999), *aff'd in part, vacated in part, and remanded,* 239 F.3d 1374 (same proposition).

### 4) *Sum of expectancy claims*

The total expectancy claim is the sum of Dr. Brumbaugh's lost profits ($25.927 million), Mr. Riggins's reduced conversion proceeds ($58.35 million), and Professor James's post–1998 capital replacement costs ($6.374 million). The expectancy claim totals $90.651 million.

### 2. *Expectancy damages—cost of replacement capital (alternative calculation)*

Plaintiff also claims cover damages, as an alternative form of expectancy damages. The doctrine of cover has been formalized in the Uniform Commercial Code ("U.C.C."). If a seller breaches a contract for the sale of goods, a buyer may "cover," which is to obtain substitute goods from another seller. U.C.C. § 2–712 (1998); E. Allan Farnsworth, Farnsworth on Contracts § 12.11 (2d ed.1998). Although the U.C.C. does not govern the transactions in this case, the Federal Circuit has deemed it "useful guidance" for applying general contract principles. *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir. 2001). Plaintiff uses the term "cover" to refer to the cost of replacing the goodwill

capital with tangible capital after the Government's breach.

To calculate cover damages, Professor James employs the preferred stock model that he developed for calculating the cost of replacement capital for the period 1998–2008. Professor James uses this model to calculate the cost of replacing all of the approximately $59 million of supervisory goodwill destroyed by the passage of FIRREA. Based on this model, Professor James estimates the cost of cover at $74.269 million. James Rpt. 42. n. 133.

Defendant contests plaintiff's capital replacement model on the same grounds that it objects to plaintiff's alternative expectancy calculation, *i.e.,* because plaintiff uses a model of capital replacement that was not available to Citizens at the time of the breach. Citizens was in mutual form at the time of the breach in 1989 until 1992, when it converted to stock form. Because replacing the lost supervisory goodwill with preferred stock was not possible without first converting to stock form, the preferred stock model is an inappropriate model on which to calculate capital replacement cost. Further, as discussed above, defendant contests plaintiff's inclusion of the cost of paying dividends in its calculation of the cost of capital replacement under the preferred stock model.

### 3. *Reliance damages*

Reliance damages are intended to put the non-breaching party in as good a position as it would have been had the contract not been made. *Glendale,* 239 F.3d at 1382–83; Restatement (Second) of Contracts § 344(b) (1981). The net costs incurred by the non-breaching party are offset by the benefits conferred on that party by the contract. Plaintiff contends that reliance damages are the costs that Citizens incurred in reliance on the goodwill contracts starting at the time of the thrift acquisitions, less any benefits the thrift received under the contracts. Professor James concludes that Citizens incurred costs as a result of the supervisory mergers, which Citizens undertook because it anticipated offsetting those costs with the benefit provided by the supervisory goodwill.

According to Professor James, the measure of the initial costs incurred by Citizens is the net liabilities assumed by Citizens in each of the acquisitions. This sum is equivalent to the amount of supervisory goodwill generated by each transaction. Professor James then offsets those costs by the benefits that the bank received under the goodwill contracts. The benefits are equal to the income earned by Citizens that can be attributed to the supervisory acquisitions, plus any residual value of the branch franchises. According to Professor James's calculation, the costs exceeded the benefits in four of the five transactions in question.[4] Professor James calculated that the overall costs incurred exceeded the benefits by $42.723 million. James Rpt. 26 n. 107 & Ex. F. Based on this analysis, plaintiff claims reliance damages equal to $42.723 million.

*Glendale* is defendant's authority for the proposition that net liabilities are not a proper measure of the benefit to the Government stemming from a supervisory transaction. 239 F.3d at 1382. Even if net liability were an appropriate measure of benefit inured to the Government, defendant argues that plaintiff has not demonstrated that the Government would have been required to absorb the thrifts' net liabilities in the absence of Citizens' takeover.

### 4. *Restitution claim*

#### 1) *Restitution claim—calculating benefit using net liability*

■ Restitution aims to restore to the non-breaching party any benefit that it might have conferred on the other party as a result of the contract, *Glendale,* 239 F.3d at 1380–81; Restatement (Second) of Contracts § 344(c) (1981), less any benefit that the non-breaching party received under the contract. Plaintiff postulates that the benefits can be measured by the actions that the Government would have undertaken had Citizens not entered into the transactions. Professor James concludes that Citizens conferred significant benefits on the Government by engaging in the supervisory acquisitions.

Professor James uses the amount of net liabilities assumed by Citizens in each of the transactions as a proxy for measuring the benefits received by the Government. In addition to saving the Government up-front costs, the Government also benefitted as a result of plaintiff's supervisory acquisitions, because it was not required to liquidate the failing thrifts and thereby expend funds from the deposit insurance fund. Professor James offsets his calculation of restitution by the benefit that Citizens enjoyed as a result of the supervisory contracts. Taking all these factors into account, Professor James calculates plaintiff's restitution claim at $106.908 million. James Rpt. 35 n. 121, Ex. T & 39.

Defendant objects to plaintiff's restitution model on the same grounds that it raised against plaintiff's reliance model. *Glendale* is cited for the proposition that net liabilities are not a proper measure of the Government's benefit as a result of a supervisory transaction. 239 F.3d at 1382. Even if net liabilities were an appropriate measure of benefit inured to the Government, plaintiff has not demonstrated that the Government would have been required to absorb the thrifts' net liabilities in the absence of Citizens' takeover.

#### 2) *Restitution claim—calculating benefits using historical data*

Plaintiff acknowledges that the Federal Circuit in *Glendale* rejected net liabilities as a measure of benefit conferred on the non-breaching party in *Winstar* cases. *See* 239 F.3d at 1382. Professor James alternatively estimates the savings to the Government by using as a proxy the historical cost to the Government of dealing with failing thrifts. Based on this historical data, Professor James concludes that supervisory goodwill costs the Government approximately 70% of the cost of liquidation. Therefore, to estimate the Government's benefit under the goodwill contracts, Professor James applies a 30% discount to the net liabilities of the failing thrifts. Pl.'s Br. filed Nov. 11, 2002,

---

4. Costs exceeded benefits in the Cardinal. Gateway, Homestead, and First Federal transactions.

James Rpt. 26 n. 107 & Ex. F.

at 17. This methodology produces an alternative restitution claim of $90.076 million. James Rpt. 41 n. 131 & Ex. V.

Defendant makes no particular response to this argument, although the Federal Circuit recently rejected a similar formula in *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1376 (Fed.Cir.2003) (*"LaSalle"*) (citing *Glendale*, 239 F.3d at 1382–83).

### 5. *Incidental damages*

Plaintiff claims incidental damages arising out of the forced conversion. This is an alternative argument to Dr. Brumbaugh's model of the But-for Bank. Mr. Riggins calculates that had the actual bank been allowed to convert at the time of its choosing, its net proceeds would have exceeded those raised by the actual bank by $30.5 million.[5] Riggins Rebuttal ¶ 76.

Defendant did not address this argument during the briefing, but did assert, in response to plaintiff's claim for lost profits, that FIRREA did not dictate the timing of Citizens' conversion to equity form.

### PROCEDURAL HISTORY

In *Fifth Third I*, this court denied both parties' motions for partial summary judgment on liability and left for resolution at trial whether plaintiff could prove the requisite negotiations, economic circumstances, and motivation of Citizens and the Government to establish a contract. In *Fifth Third Bank of Western Ohio v. United States*, 52 Fed.Cl. 637 (2002) (*"Fifth Third II"*), this court ruled that officials of the Cincinnati office of the Federal Home Loan Bank Board had implied authority to enter into the goodwill contracts at issue. Most recently, the court, in *Fifth Third Bank of Western Ohio v. United States*, 52 Fed.Cl. 829 (2002) (*"Fifth Third III"*), ruled that the Government lacked authority to enter into the Sentry goodwill contract and that plaintiff's Sentry-based claims are time barred. Plaintiff's claims arising out of the acquisition of Sentry have been dismissed. After trial was sched-

uled to begin in early March 2003, defendant submitted a motion for summary judgment, pursuant to RCFC 56, with respect to plaintiff's damages claims, arguing that the damages models upon which plaintiff relies are contrary to *Winstar* precedent and fail to demonstrate the fact or amount of injury.

### DISCUSSION

#### I. *Summary judgment*

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir. 2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Monon Corp.*, 239 F.3d at 1257.

No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir. 1996). In such cases there is no need for a trial, and the motion for summary judgment must be granted. Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of

---

5. The same reasoning would seem to apply with equal force to any losses directly attributable to

Citizens' sale of the Cincinnati division.

fact] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Eli Lilly and Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001); *General Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir.1999). If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, the motion for summary judgment should be denied.

Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir. 1998). The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the movant can demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.1997) (citing *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir. 1994)); *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997).

Of significance to defendant's motion is the Supreme Court's pronouncement in the 1986 trilogy—*Celotex, Anderson,* and *Matsushita*—that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1). Thus, although disposition of a motion for summary judgment is guided by the rules and presumptions that protect against improvident grants, summary judgment is an appropriate method for resolving cases that do not meet the threshold established by Supreme Court precedent. That a case implicates large amounts of money or complex factual and legal issues is no bar, provided that the movant demonstrate that it is entitled to summary judgment as a matter of fact and law.

The Supreme Court in *Celotex* held that a party moving for summary judgment need not prove the absence of a material fact. 477 U.S. at 324–25, 106 S.Ct. 2548. Rather, the moving party may discharge its burden by showing that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case for which it bears the burden of proof. *Id.* at 322, 106 S.Ct. 2548; *see also American Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001). The nonmoving party may not rest on mere allegations, but "must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not it is accompanied by affidavits and/or other documentary evidence. *Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548. However, in order to prevail by demonstrating that a genuine issue exists, the nonmoving party must go beyond the pleadings on file by submitting evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

## II. *Expectancy damages*

The Court of Federal Claims has struggled with the appropriateness of granting motions for summary judgment with regard to expec-

tancy damages claims. In several cases, the court, citing Federal Circuit precedent in *Cal Fed*, rejected altogether the use of summary judgment with respect to expectancy damages.

In *Citizens Federal Bank, FSB v. United States*, 52 Fed.Cl. 561 (2002), the banks sought damages based on their liabilities arising from the passage of FIRREA. They claimed, *inter alia*, lost profits that would have been realized had the breach not occurred. Lost profits were predicated on the diminution of the banks' capital value, based on a model developed by Professor James. Defendant disputed Professor James's figures. The court denied summary judgment, citing *Cal Fed*. *Citizens*, 52 Fed.Cl at 563 (" 'Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if facts are in dispute.' ") (quoting *Cal Fed*, 245 F.3d at 1350). The court therefore concluded: "In the instant case, because the Court finds certain material facts in dispute, summary judgment either for Defendant or for [plaintiff] is inappropriate." *Id.*

In another *Winstar* case, *Columbia First Bank, FSB v. United States*, 54 Fed.Cl. 693 (2002), defendant argued that the bank was barred from recovering lost profits because plaintiff's model for calculating such lost profits was "fatally speculative" and that plaintiff's lost profits were not foreseeable. *Id.* at 695. The court quoted *Cal Fed* at length. *Id.* at 702 ("The Federal Circuit has stated that 'both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute.' ") (quoting *Cal Fed*, 245 F.3d at 1350). The *Columbia* court therefore concluded:

> [P]laintiff in this case has presented substantial documentary, deposition, and expert evidence. The evidence includes financial documents, depositions from former officers detailing lost opportunities, and extensive expert reports detailing the sources of [plaintiff's] hypothetical lost profits and describing the methodology by which the expert conclusions were reached. In its opening brief, defendant attempted to distinguish

this case from *Cal. Fed.* by arguing that here plaintiff "fails to identify a single profitable asset that the alleged breach caused [plaintiff] to sell or was precluded from owning, nor has [it] demonstrated any lost profits from those specific assets." Def.'s Mot. at 39. Notwithstanding that assertion, the court cannot find the absence of a genuine issue of material fact on this record. Therefore, summary judgment on the issue of lost profits is not appropriate in this case.

*Id.* at 702.

Again in *Franklin Federal Savings Bank v. United States*, 55 Fed.Cl. 108 (2003), the court refused to grant a summary judgment motion in defendant's favor with respect to a claim for lost profits. *Id.* at 140. The thrift sought a trial on: 1) lost profits and 2) the cost of replacing supervisory goodwill eliminated by FIRREA with tangible capital. *Id.* at 130. Defendant moved for summary judgment with respect to those claims on the grounds that the damages theories were legally defective and that the losses claimed were speculative. *Id.* Plaintiff responded with issues of disputed material fact that the court agreed precluded granting summary judgment.

As examples of such disputed material facts, the court noted, *inter alia*, defendant's contention that plaintiff's model provided no information about the types of investments that the bank would have made absent FIRREA. *Id.* at 133. Plaintiff responded by submitting the declaration of the thrift's president and CEO, who described the thrift's investment strategy at the time of the breach. Plaintiff also submitted evidence that FIRREA caused other injury to the bank. *Id.* The court quoted *Cal Fed*. *Id.* at 133 (" 'Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if facts are in dispute.' ") (quoting *Cal Fed*, 245 F.3d at 1350). The court also cited Federal Circuit precedent in *Glendale* as supporting the right of plaintiff to go to trial on its claim for

lost profits. *Id.* at 133 (citing *Glendale,* 239 F.3d at 1380).

In two other cases the court has rejected a *Winstar* plaintiff's lost profits model after trial on damages.[6] In no *Winstar* case after *Cal Fed* has the Court of Federal Claims granted the Government's motion for summary judgment with regard to a plaintiff's lost profits claim.

The Federal Circuit in *Cal Fed* acknowledged lost profits as " 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.' " 245 F.3d at 1349 (quoting *Neely v. United States,* 152 Ct.Cl. 137, 146, 285 F.2d 438, 443 (1961)). The *Cal Fed* court also quoted from *Wells Fargo Bank v. United States,* 88 F.3d 1012, 1022–23 (Fed.Cir.1996) (*"Wells Fargo"*), in detail for the proposition that a non-breaching party can recover lost profits that are foreseeable and the proximate results of the breach. *Id.* at 1349 (citing *Wells Fargo,* 88 F.3d at 1022–23). Based on the reasoning in *Wells Fargo,* the *Cal Fed* court concluded that "[p]rofits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages." *Id.*

The Federal Circuit recounted that the Court of Federal Claims in *Cal Fed* had conducted pre-trial hearings on expectancy damages generally and had reviewed briefs submitted on the subject, as well as "a lengthy appendix that consisted mostly of business plans and related data." 245 F.3d at 1349. After engaging in this review, the Court of Federal Claims ruled that the bank could not establish lost profits as a matter of law.

On appeal the bank argued that the Government's breach caused it injury and that it had submitted documentary evidence to show that it sold significant assets in the wake of the breach. It also had submitted a business plan and OTS documents allegedly showing its intent to invest in low-risk assets that it

alleged were ultimately profitable. The bank provided documentation of specific mortgages that it was forced to sell to remain in capital compliance after FIRREA's enactment. The bank also traced the performance of those mortgages in order to calculate its lost profits. Evidence was submitted to show that the bank was forced to sell a thrift in order to meet its capital requirements. The bank also offered evidence of "its past performance, its pre-breach business plans, data on the performance of other thrifts in the post-breach period, and historical evidence of assets that it allegedly had to sell to remain in capital compliance." 245 F.3d at 1350.

After summarizing this evidence, the Federal Circuit held:

> Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute. [RCFC] 56(c). [Plaintiff] submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits.

245 F.3d at 1350.

1. *Appropriateness of summary judgment in case at bar*

When making a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) (nature of summary judgment proceeding is such that trial judge does not make findings of fact). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505; *Jay v.*

---

**6.** *See Suess v. United States,* 52 Fed.Cl. 221, 228 (2002); *Bank United of Texas FSB v. United*

*States,* 50 Fed.Cl. 645, 656 (2001).

*Sec'y of HHS,* 998 F.2d 979, 982 (Fed.Cir. 1993).

The court is mindful of the Federal Circuit's admonition in *Cal Fed.* After that decision, it would be the *rara avis,* indeed, that could merit summary judgment. A court never errs by declining to grant summary judgment when the better, or more prudent, course is to proceed to trial. *See Anderson,* 477 U.S. at 253–54, 106 S.Ct. 2505 (" 'If [a judge] concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.' ") (quoting *Curley v. United States,* 160 F.2d 229, 232–33 (D.C.Cir. 1947)). Three judges recently denied summary judgment with respect to expectancy claims on the ground that the appellate court had indicated that these claims must be tried.[7]

Most respectfully, this court interprets the Federal Circuit as reinforcing established jurisprudence on summary judgment and not stating a rule applicable to all *Winstar* cases. Several principles guide the court's analysis of the facts and arguments adduced by the parties in support of their respective positions. The first is that the Supreme Court has expressed a preference for summary judgment in the era of notice pleading, in appropriate cases, as the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548. The second, and countervailing, principle is that a precipitous grant of summary judgment can disserve the interests of justice. If error is committed and the matter remanded for adjudication of the facts, trial has been postponed with the concomitant costs and inconvenience to the parties and their witnesses. A third principle is that the success *vel non* of a similar claim after trial is not an appropriate consideration. In evaluating defendant's motion under the standards for summary judgment and plaintiff's rebuttals to defendant's arguments, the court has fol-lowed these three principles to the best of its ability. Specifically, the court has read plaintiff's expert reports-not defendant's; the court has queried plaintiff at argument as to the specifics of its proofs; the court has followed the guidance of *Cal Fed;* and the court has reviewed carefully the facts, arguments, and resolutions of other summary judgment motions decided by judges of the Court of Federal Claims.

### 2. *Lost profits and related claims*

■ The Federal Circuit has expressed a preference for expectancy damages as the measure of damages in *Winstar* cases. As the Federal Circuit noted in *Glendale,* "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale,* 239 F.3d at 1380 (citing Restatement (Second) of Contracts § 344(a)). Lost profits are a form of expectancy damages properly recoverable from breach of a goodwill contract. *Cal Fed,* 245 F.3d at 1349 (citing *Wells Fargo,* 88 F.3d at 1022–23).

The Federal Circuit in *Wells Fargo* distinguished between lost profits that a court can properly award and other injuries that are too remote to be the subject of a damages award on a lost profits theory. In that case plaintiff bank had signed a contract with the Government whereby the latter had agreed to guarantee loans to ethanol manufacturers. The Government refused to guarantee a certain loan (the "High Plains loan") to such a manufacturer, forcing plaintiff bank to "charge off" $9.7 million on the loan, which resulted in an equal reduction in plaintiff's capital. The capital reduction impaired plaintiff's ability to extend other loans that were not the subject of the original contract. Plaintiff brought suit against the Government for breach of contract claiming, *inter alia,* damages from the High Plains loan and lost profits for the bank's inability to extend other loans due to the capital reduction. The Court of Federal Claims awarded damages for both claims.

7. *See Franklin,* 55 Fed.Cl. at 134; *Columbia,* 54 Fed.Cl. at 702; and *Citizens,* 52 Fed.Cl. at 563.

The Federal Circuit reversed the Court of Federal Claims' award of lost profits. The appellate court held that lost profits could be recovered as damages only if they would have " 'accrued and grown out of the contract itself,' " as the " 'direct and immediate results' " of the contract being carried out. 88 F.3d at 1023 (quoting *Ramsey v. United States*, 121 Ct.Cl. 426, 435, 101 F.Supp. 353, 358 (1951)). The court did not allow plaintiff to recover damages due to " 'other independent and collateral undertakings, ... although entered into in consequence and on the faith of the principal contract.' " *Id.* Such collateral undertakings are " 'too uncertain and remote' " to be the subject of an award under the lost profits theory. *Id.* The court also disagreed with the Court of Federal Claims' holding that the lost capital was foreseeable at the time of contracting.

The court therefore reversed the trial court's award of lost profits for the forgone loans. By the same reasoning, the court affirmed the trial court's damages award for the High Plains loan, which was the specific purpose of the Government's guarantee. 88 F.3d at 1024 ("Unlike the lost profits damages, which we have concluded were too remote and uncertain, the $389,423 of High Plains' indebtedness that [plaintiff] wrote off ... was a direct result of the government's breach.").

The *Cal Fed* court quoted *Wells Fargo* for the proposition that a non-breaching party can recover lost profits that are the foreseeable and proximate results of the breach:

"If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement .... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

245 F.3d at 1349 (quoting *Wells Fargo*, 88 F.3d at 1022–23). The court in *Cal Fed* thus concluded that plaintiff could recover lost profits if: 1) plaintiff established definitely that profits would have been lost; 2) plaintiff's loss was the proximate result of FIRREA; and 3) some basis was advanced on which to estimate reasonably the amount of lost profits. *See id.* at 1349–50.

The Federal Circuit more recently applied the same principle to the opposite side of the equation: the question of how much of plaintiff's mitigation efforts should offset a damages award. *See LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363 (Fed. Cir.2003) ("*LaSalle*"). Plaintiff in *LaSalle* was a failing thrift as a result of FIRREA. ABN AMRO eventually took over the thrift and made it a subsidiary, and the thrift eventually became profitable again. In measuring mitigation of injury caused by the breach, the trial court limited plaintiff's recovery to the position that it occupied prior to the breach. Thus, the court included in its mitigation calculation two categories of investment by ABN AMRO—one loan for $300 million, which occurred immediately after ABN AMRO's takeover in an effort to comply with FIRREA, and the other for loans totaling $800 million, which represented subsequent cash investments-and the profits therefrom. The Federal Circuit rejected the inclusion of the entire $1.1 billion cash investment as the proper measure of plaintiff's mitigation expenses, limiting the amount to the initial $300 million required by FIRREA for recapitalization. "The general rule is as articulated by Justice Holmes, that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong: 'The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss.' " *LaSalle*, 317 F.3d at 1373 (quoting *Southern Pac. Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 533–34, 38 S.Ct. 186, 62 L.Ed. 451 (1918)).

The Federal Circuit took the holding in *Cal Fed* one step further in *Energy Capital Corporation v. United States*, 302 F.3d 1314

(Fed.Cir.2002). Although not a *Winstar* case, *Energy Capital* applied *Winstar* precedent to award lost profits to a financing corporation that brought suit against the Government for breach of contract.

Plaintiff in *Energy Capital* was a financing corporation that signed a contract with the Department of Housing and Urban Development ("HUD"), eliminating regulatory barriers to financing energy improvements in HUD properties. The agreement was known as the Affordable Housing Energy Loan Program, or AHELP, and provided for plaintiff to extend loans to owners of HUD properties. After the Government breached the contract by canceling the program, plaintiff sued for lost profits.

In order to prove lost profits, the trial court required plaintiff to show causation, foreseeability, and reasonable certainty. *Energy Capital*, 302 F.3d at 1319. Having found that plaintiff had made an adequate showing, the trial court awarded the profits plaintiff lost by not being able to extend AHELP loans. Defendant appealed the lost profits award as too speculative because a large number of variables influenced AHELP loans, thereby rendering the calculation of lost profits remote and speculative.

The Federal Circuit disagreed, affirming the lost profits award. Applying the analysis from *Wells Fargo*, the Federal Circuit viewed plaintiff's anticipated profits as flowing directly from the contract, not from collateral undertakings. *Energy Capital*, 302 F.3d at 1328. Because the loan market was well defined, the appeals court deemed that the trial court reasonably could estimate the percentages of first mortgagees that would have consented to AHELP loans. Accordingly, the trial court established the requisite causal link between the contract and plaintiff's lost profits.

Plaintiff in the case at bar presents the expert testimony of Dr. Brumbaugh to support its claim for lost profits. *See generally* Report of Dr. R. Daniel Brumbaugh (June 28, 2001) ("Brumbaugh Rpt."). Dr. Brumbaugh's model projects that Citizens would have been a larger institution if it could have levered supervisory goodwill as an asset. His model calculates returns based on Citizens' actual performance, assuming that the mix of the But-for Bank's assets and liabilities would have been fundamentally the same as that of the actual bank. The returns are adjusted to assume that the Cincinnati division would not have been sold and are adjusted further for certain non-recurring costs. Dr. Brumbaugh calculates lost profits through March 1998, the last full quarter before Fifth Third acquired Citizens in June 1998. Dr. Brumbaugh concludes that lost profits from the loss of supervisory goodwill total $25.927 million. Brumbaugh Rpt. 25–28, 32–36; Rebuttal Report of Dr. R. Daniel Brumbaugh (Sept. 26, 2002) ("Brumbaugh Rebuttal"), Ex. C.

Dr. Brumbaugh acknowledges only three major elements of the But-for Bank that differ from the performance of the actual bank: 1) the growth in assets, *i.e.*, restoration of goodwill; 2) the return of the Cincinnati division; and 3) the assumption that Citizens would not have had difficulty meeting its tangible capital requirements. Brumbaugh Rpt. 26. With regard to the third assumption, which is not based on the actual bank's performance, Dr. Brumbaugh postulates that Citizens would have purchased recourse insurance at an earlier date in order to bring the bank into capital compliance.

Dr. Brumbaugh also calculates reduced conversion proceeds. He assumes that Citizens would not have conducted its mutual-to-stock conversion as early as it did absent FIRREA's implementing regulations. Plaintiff's expert Mr. Riggins asserts that Citizens, absent the breach, would have converted in the third quarter of calendar year 1993. Report of Ronald S. Riggins 36 (June 28, 2001) ("Riggins Rpt."). Mr. Riggins discusses the process by which a bank decides to convert to stock form. Stock conversions are governed by federal and state regulations, depending on the converting institution's charter type. Converting institutions take a "market value approach," which means that they generate conversion appraisals valued on the basis of market pricing characteristics of common stocks of similar publicly traded thrift institutions (known as the "Peer Group"). Riggins Rpt. 6.

Citizens first discussed converting to stock form in mid–1986, but abandoned those plans in mid-October 1986, when market conditions deteriorated. The bank again reconsidered its conversion plans in 1989, but decided against converting because of the projected decline in proceeds. Mr. Riggins attributes the decline to the bank's weakened financial position "due to a decline in core earnings and negative publicity surrounding the thrift industry and enactment of FIRREA." Riggins Rpt. 14. Mr. Riggins states that Citizens "converted to stock form during the required timetable established by the OTS, not at a point when the Bank, or its investment bankers, believed conversion was appropriate." Riggins Rpt. 18. Citizens' actual net proceeds from the conversion were $31.9 million. Riggins Rpt. 31.

Mr. Riggins then calculates the amount that Citizens would have netted had FIRREA not become law. Mr. Riggins's calculation therefore includes Dr. Brumbaugh's assumption that Citizens would not have sold the Cincinnati division absent the breach. As a result, "Citizens would have maintained a larger balance sheet, higher earnings, greater equity and tangible capital and the Bank would have served another major market urban area." Riggins Rpt. 33. Given the But-for Bank's stronger financial profile, it would have been postured to "time the market," Riggins Rpt. 34, giving Citizens the opportunity to select the timing for its stock conversion. Moreover, the OTS would not have required the But-for Bank to complete the stock conversion by March 31, 1992. Mr. Riggins notes that the market showed significant recovery in 1993 and that senior officers at Citizens indicated they would not have converted in 1991–1992, but would have considered August 1993 a more opportune time. Therefore, Mr. Riggins times the conversion to have occurred at the time of Citizens' subordinated debt offering, which closed on August 19, 1993. Specifically, he uses "market prices as of Friday, August 20, 1993, in determining the *pro forma* market value in the non-breach environment." Riggins Rpt. 36.

In addition to assuming the breach did not take place, and hypothesizing the date on which Citizens would have converted, Mr. Riggins makes another adjustment to real-world events: He changes the composition of Citizens' Peer Group. Kaplan Associates, Inc., conducted the Conversion Valuation Reports for Citizens and had composed a Peer Group for Citizens. However, two of the Peer Group members were subject to pending acquisitions as of August 20, 1993, which inflated the pricing multiples. Mr. Riggins therefore replaces those banks with others to meet the minimum requirement of ten institutions per Peer Group. Riggins Rpt. 37.

Mr. Riggins assumes the same conversion structure, but adjusts it for the changed circumstances, *i.e.*, lowering the reinvestment rate due to the decline in interest rates between the actual conversion and the But-for Bank's later appraisal date. Under Mr. Riggins's deferred conversion scenario, Citizens would have received net proceeds of $95 million, a net increase of $58.35 million more than the actual bank's conversion proceeds. The difference reflects damages to the bank. Rebuttal Report of Ronald S. Riggins ¶ 85 (Sept. 26, 2002) ("Riggins Rebuttal"). Dr. Brumbaugh incorporates Mr. Riggins's conclusions into his calculation of lost profits.

Finally, Dr. Brumbaugh calculates the lost value of goodwill, also referred to as capital replacement costs. This figure reflects the cost of replacing goodwill as a form of capital.

The cost-of-replacement-capital calculation, performed by Professor James, provides a surrogate for lost profits from 1998–2008, when the But–For Bank would have amortized fully the supervisory goodwill. Because supervisory goodwill is a unique asset and cannot otherwise be modeled, Professor James uses preferred stock as a proxy for supervisory goodwill, but adjusts the model to account for differences between the two.

Professor James's replacement cost model purports to estimate the cost that Citizens would have incurred had it raised cash to replace goodwill phased out by FIRREA by issuing preferred stock. Professor James also adjusts the model to account for differences between preferred stock and supervisory goodwill. While preferred stock is similar to supervisory goodwill in that it counts

as regulatory capital, it also differs in significant respects. For example, a bank issuing preferred stock incurs costs in the form of transaction costs, as well as dividend payments. Supervisory goodwill, by comparison, does not entail such costs. However, preferred stock also carries benefits that are not associated with supervisory goodwill. Supervisory goodwill is not a tangible asset, so the bank cannot invest it and earn a return as it could with the cash raised from preferred stock. Professor James assumes that the cash obtained through the issuance of replacement preferred stock would be used to pay off some of the bank's liabilities, but notes that goodwill could not be utilized in such a manner.

Next, Professor James calculates the required dividend payments to investors who would buy the preferred stock. "A review of high-yield bond indices and the rate at which industrial companies issued high yield preferred in 1989 suggests a required dividend in the range of 14% to 25%." Report of Professor Christopher James 43 (June 28, 2001) ("James Rpt."). Because the industry received bad publicity in the wake of FIRREA, Professor James concludes that "investors would have required a dividend rate as high as 25% to invest in Citizens stock." James Rpt. 45. However, despite the subdued outlook of the banking industry in the late 1980's, Professor James chooses a "conservative" after-tax rate of 14% for his analysis. James Rpt. 45.

Professor James then attempts to estimate lost profits after the date of Citizens' acquisition by plaintiff in 1998. These lost profits are measured by the damages incurred by plaintiff due to its inability to lever goodwill from 1998 to the end of the goodwill's amortization period in 2008. Based on this model, Professor James estimates that the net present cost of replacing the supervisory goodwill possessed by the But-for Bank after June 1998 is $6.374 million. James Rpt. 47–49 & n. 155.

In essence, plaintiff takes what it represents to be a conservative approach by projecting, up to 1998, the year when plaintiff acquired Citizens, the real-world, actual experience of Citizens in the marketplace, without the negative effects of the breach, i.e., loss of goodwill as an asset, a premature conversion date, and the sale of the Cincinnati branches. Dr. Brumbaugh's approach is to 1) restore the forgone supervisory goodwill in the But-for Bank; 2) lever the goodwill to generate growth in the But-for Bank's incremental assets; and 3) apply a rate of return on those assets to calculate forgone earnings. Brumbaugh Rebuttal 66.

In his rebuttal report, Dr. Brumbaugh states:

> In the years that follow the But-for Bank's conversion (fiscal years 1994–1998), the core capital level of the But-for Bank exceeds that of the actual bank. It does so because it is able to raise more capital than the actual bank, and therefore maintain a higher capital level. During those years, the But-for Bank levers less than it would otherwise have done, if it had maintained a core capital ratio closer to or identical to [that of] the actual bank. In my opinion this approach takes into consideration all of the relevant economic and regulatory considerations, is based on observable data, and reflects an approach that can be considered not only reasonable, but conservative.

Brumbaugh Rebuttal ¶ 285. Dr. Brumbaugh also testified, as follows:

Q: Have you identified any opportunities to grow the bank subsequent to its conversion that the actual bank did not pursue?

A: As a factual matter I don't believe there is any, ... I don't believe there is any information in the record that indicates that there were additional opportunities to grow, as you put it, that the actual bank could have taken advantage of.

Deposition of Dr. R. Daniel Brumbaugh at 455 (Sept. 12, 2001).

Thus, Dr. Brumbaugh assumes that Citizens would have grown and profited with the adjusted asset base fully levered by the restoration of goodwill in the same manner as Citizens grew in the real world with its reduced asset base. However, he does not identify any business opportunities that Citizens would have pursued, or the markets that it would exploit as a But-for Bank, or

the allocation of assets in any particular type of investment. The entire claim for lost profits assumes that a But-for Bank, with its adjusted asset base, would mimic Citizens' own experience in the post-FIRREA real world.

Plaintiff ascribes a level of certainty to this approach in that it is reflective of real-world events as they actually played out, *i.e.*, Citizens' experience. Defendant resists this characterization, finding fatal the assumption that this experience can be projected based only on the assumption that a larger Citizens (without FIRREA) would have the same success as Citizens achieved (with FIRREA).

Plaintiff's model fails to account for any real-world events other than the profitability of Citizens during the 1990's before its purchase by plaintiff. Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But–for–Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

The Federal Circuit in *Cal Fed* found "considerable evidence" that "more than sufficed" to warrant trial. 245 F.3d at 1350. The bank had submitted documentary evidence that it sold assets in the wake of the breach. It also submitted business plans and OTS documents purporting to show its intent to invest in certain assets. It provided specific documentation of single-family adjustable rate mortgages that it was forced to sell due to FIRREA. The bank traced the post-sale performance of those mortgages to show that they ultimately would have been profitable. The bank also submitted evidence to show that it was forced to sell a profitable business unit to meet capital requirements. The bank offered evidence of its past performance, its pre-breach business plans, data on the performance of other thrifts in the post-breach period, and historical evidence of assets it

allegedly had to sell to remain in capital compliance. *Id.* at 1349–50.

Plaintiff correctly points out that the Federal Circuit in *Cal Fed* did not state or imply that these types of evidence were exhaustive. By the same token, however, defendant is correct that the appeals court did not state or imply that the proffer of expert reports and voluminous documentation defeats summary judgment. Although the recitals of evidence in *Cal Fed* did not establish a list of facts that must be present to survive summary judgment, they did reflect the nature and quality of evidence that the Federal Circuit ruled sufficient to withstand a summary judgment motion.

In this case evidence tending to show shrinkage of the asset base would be the forced sale of the Cincinnati division and the forced premature conversion from mutual to stock form. However, the court rejects as a matter of fact and law the notion that a bank's expanded asset base would realize profits at a similar rate to that of its actual profits, absent an offer of evidence to show how the bank would have invested the augmented assets. Plaintiff in the case at bar merely asserts that the But-for Bank would have replicated everything Citizens did in the real world during the relevant period. This showing is insufficient to defeat defendant's motion for summary judgment.

The court in *Coast Federal Bank, FSB v. United States*, 48 Fed.Cl. 402 (2000), found that the bank had proffered evidence that could establish that the requisite proximity existed between a breach and specific investment opportunities that were thwarted. Indeed, plaintiff in the present case cites *Coast* for the proposition that because plaintiff and defendant have presented competing theories about what would have happened in the but-for world, the court cannot choose to credit one theory over the other. However, in *Coast* the bank had submitted evidence of specific assets that were divested as a result of the breach, such as deposit franchises in San Diego and the Central Valley of California, as well as mortgage loans of various types. The model was based on evidence that plaintiff could have originated an additional $4.4 billion in single-family adjustable-

rate mortgages. 48 Fed.Cl. at 433–34. Plaintiff in the case at bar has submitted no such evidence regarding investment opportunities.

Plaintiff complains that defendant would have it identify new homeowners and new mortgagors who would have taken out loans from Citizens. To the contrary, defendant more modestly and realistically asks for some indication of how assets would be allocated *vis-à-vis* various business opportunities. Plaintiff cannot have it both ways: If it presumes that the But-for Bank would have approximated the same success in much the same measure as the real-world Citizens, it must take account of the business prospects that were available to the But-for Citizens with its expanded asset base.

The Federal Circuit recently observed: "[W]e remark that when damages are hard to estimate, the burden of imprecision does not fall on the innocent party. 'If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" *LaSalle,* 317 F.3d at 1374 (quoting *Locke v. United States,* 151 Ct.Cl. 262, 266, 283 F.2d 521, 524 (1960)). Nonetheless, the venerable precedent that makes allowance for proof that is flawed merely as to the amount of damages does not displace the case law that requires proximity of cause and result. In *LaSalle* the Federal Circuit specifically noted that proximity, as contrasted with remoteness, is a critical factor in the damages analysis. 317 F.3d at 1371.

In evaluating defendant's summary judgment motion, the court assumes that plaintiff can establish that it would have levered goodwill exactly as Dr. Brumbaugh postulates and that plaintiff can prove that the breach forced the shrinkage of assets and the

loss on conversion from mutual to stock form. However, the court cannot presume proof of missing elements, to wit, what investments plaintiff would have made or activities in which it would have engaged in a hypothetical world without FIRREA and with its competitors restored to the real-world banking environment.[8] The court therefore grants summary judgment for defendant with respect to plaintiff's expectancy claims.

### 3. *Cover*

■ Professor James also proposes an alternative calculation of expectancy damages based on the doctrine of cover. To calculate cover damages, Professor James uses the preferred stock model that he developed for calculating the cost of replacement capital for 1998–2008, as discussed above, to calculate the cost of replacing all of the approximately $59 million of supervisory goodwill destroyed by the passage of FIRREA. Using this model, Professor James estimates the loss at $74.269 million. James Rpt. 42 n. 133.

Defendant finds that the James model is infirm for two reasons: first, because it is purely hypothetical, and, second, because does not properly determine replacement cost damages. Defendant cites two Federal Circuit cases which it contends repudiates plaintiff's cost-of-replacement-capital theory: the Court of Federal Claims' holding in *Cal Fed* and the Federal Circuit precedent in *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir. 2001). Plaintiff also relies on *Hughes* for the proposition that Citizens can claim cover damages if it can show "what it *would have cost* to replace the regulatory capital destroyed by the government's breach …." Pl.'s Br. filed Nov. 11, 2002, at 31–32.

---

**8.** The Federal Circuit in *Micro Chemical, Inc v. Lextron, Inc.,* 317 F.3d 1387 (Fed.Cir.2003), elucidates the *Daubert* requirements derived from Rule 702 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that trial courts are gatekeepers in determining fitness of scientific expert testimony for admissibility at trial). A trial court should not exclude an expert witness's testimony on the basis of the facts relied on by the expert witness. The focus of the trial court in a *Daubert*

analysis should be whether the expert has shown a "reliable foundation in principles and method" for the sponsored opinion. *Micro Chemical,* 317 F.3d at 1392.

Defendant argues that the court should reject Dr. Brumbaugh's model in an exercise of the court's gatekeeping function under *Daubert.* Although the court does not consider it necessary to characterize its analysis as a *Daubert* inquiry, finding Dr. Brumbaugh's damages model to be speculative is tantamount to rejecting its reliability in principles and method.

The Government breached a contract in *Hughes* requiring use of its best efforts to launch ten of plaintiff's HS–393 satellites on space shuttles. After the Challenger explosion in January 1986, NASA suspended operation of shuttles until September 1988, and President Reagan announced that NASA would no longer launch commercial satellites on shuttles. The Government did not launch any of the HS–393's on shuttles, but it did launch three HS–393's on expendable launch vehicles (ELV's) after 1986. During the same time period, plaintiff also launched other similar satellites on ELV's, including six HS–601 satellites, which were better suited for ELV launches. Plaintiff then sued the Government for breach of contract for failing to launch all ten HS–393 satellites on shuttles.

The trial court calculated damages to plaintiff by comparing the cost of launching ten HS–393's on shuttles with the higher cost of launching the same on ELV's. However, because the court found the Government could have launched only five HS–393's with its best efforts, plaintiff was awarded damages for the increased cost of launching five satellites on ELV's. To arrive at a damages award for five satellites, the court awarded plaintiff the actual cost of launching the three satellites. In calculating the cost of the fourth and fifth satellites, the court averaged the cost of the three satellites actually launched and applied that average for the fourth and fifth satellites.

On appeal defendant argued that plaintiff's recovery should be limited to the increased cost of launching the three satellites that it actually sent up on ELV's, because the HS–601's replaced them. Rejecting this argument, the Federal Circuit noted:

> [E]ase of proof in potential future litigation is not sufficient justification to require plaintiff to continue launching satellites that were ill-suited for ELV launches. As the victim of the breach, [plaintiff] was within its rights to obtain commercially reasonable substitute launch services even if the substitute services were not identical to those covered by the [agreement].

*Hughes,* 271 F.3d at 1067.

Plaintiff's argument in the case at bar is based on a misreading of *Hughes.* Defendant maintains, and the court agrees, that the Federal Circuit in *Hughes* held that a cover damages theory must be based on a reasonable form of cover. Plaintiff points out that the Federal Circuit in *Hughes* based damages on a model that calculated the cost to deliver all five HS–393 satellites, whereas plaintiff had launched only three such satellites. However, while launching the HS–393 satellites was not impossible, NASA's post–1986 regulations made launching HS–601's the more prudent course of action. *Hughes* demonstrates that a reasonable form of cover can be used to calculate expectancy damages, but a party cannot calculate expectancy damages using a form of cover that would not have been possible under the circumstances. *Hughes* therefore does not assist plaintiff's expectancy theory.

The Court of Federal Claims has rejected the theory that models for preferred stock can be used to calculate cost of replacement capital for goodwill lost through the enactment of FIRREA. The Court of Federal Claims in *Glendale Federal Bank v. United States,* 43 Fed.Cl. 390, 398 (1999), *aff'd in part, vacated in part, and remanded,* 239 F.3d 1374; *California Federal Bank v. United States,* 43 Fed.Cl. 445, 461 (1999), *aff'd in part, vacated in part, and remanded,* 245 F.3d 1342; and *Bank United of Texas v. United States,* 50 Fed.Cl. 645, 654–55 (2001), focused on the actual costs that the thrifts incurred. Awards were based on the transaction cost of raising the new capital. The Federal Circuit affirmed this approach in *Cal Fed:* ("We see no clear error in the court's finding that the floatation costs [*i.e.,* transaction costs] provided an appropriate measure of plaintiff's damages incurred in replacing the supervisory goodwill with tangible capital.") 245 F.3d at 1350. *Landmark Land Co. v. United States,* 46 Fed.Cl. 261 (2000), *aff'd in part, vacated in part, reversed in part, and remanded, Landmark Land Company v. United States,* 256 F.3d 1365 (Fed.Cir.2001), supports this approach; there, the Court of Federal Claims rejected the preferred stock model because no evidence was adduced that the bank incurred any actual cost in raising replacement capital before the thrift failed.

46 Fed.Cl. at 274.[9] *See also Franklin,* 55 Fed.Cl. at 137.

The law does not recognize Professor James's theory. Citizens could not have covered by issuing preferred stock, because it existed in mutual form at the time in question. The court therefore grants defendant summary judgment on plaintiff's claim for cover damages.

### III. *Restitution*

#### 1. *Restitution claim—calculating benefit using net liability*

■ Professor James concludes that Citizens conferred significant benefits on the Government by engaging in the supervisory acquisitions. Plaintiff measures the benefits by the actions that the Government would have undertaken had Citizens not entered into the transactions. Professor James goes so far as to assert that the net liabilities figure is a conservative one, because it "do[es] not include the administrative expense of liquidating the assets of a failing institution and paying off the insured depositors." James Rpt. 36. Professor James sponsors the opinion that the amount of net liabilities assumed by Citizens in each of the transactions is a reasonable proxy for measuring the benefits received by the Government. He reasons that if Citizens had not acquired the failing thrifts, the Government would have been required to seize them and thereby incur their liabilities. The banks' liabilities thus represent a cost saved by the Government and a benefit conferred on the Government by plaintiff. Professor James calls these "up-front costs." James Rpt. 37.

In addition to saving the Government up-front costs, the Government also benefitted as a result of plaintiff's supervisory acquisitions, because it was not required to liquidate the failing thrifts and thereafter to expend funds from the FDIC insurance fund. As a result, the Government was able to continue earning investment income on the fund. Plaintiff counts that investment income towards its restitution claim.

Professor James's calculation of restitution is offset by the benefit that Citizens enjoyed as a result of the contract, *i.e.,* income generated from the acquisitions, plus a terminal value of the franchises acquired, less the cost of acquisition. Taking all these factors into account, Professor James estimates plaintiff's restitution claim at $106.908 million. James Rpt. 35 n. 121, Ex. T & 39.

The Federal Circuit established in *Glendale* that net liabilities are not a proper measure of the benefit the Government received from a supervisory merger. The thrift claimed a restitution based on the assumed risk that it undertook in acquiring a failing thrift, First Federal Savings and Loan Association of Broward County, Florida ("Broward"):

> This was done by taking the value of Broward's obligations or debts at the time the contract was made, and subtracting from it Broward's then-assets. The resulting figure ... was deemed to be the amount that the Government benefitted from the contract, and to which [plaintiff] was entitled as restitutionary damages. [sic]

*Glendale,* 239 F.3d at 1381. The court held that restitution could not be premised on this calculation. *Id.* at 1382. Although the Federal Circuit acknowledged that the supervisory merger benefitted the Government, "[a]t the same time, the action taken by the purchasing S & L in acquiring the failing thrift did not result in the Government ... saving the dollar value of the net obligations of the thrift .... In a very real sense, what the Government received in exchange for its promise was time." *Id.* The Federal Circuit in *Cal Fed* also rejected a restitution claim based on the assumption of liabilities by a surviving thrift. 245 F.3d at at 1351–52. Federal Circuit precedent is unwavering that restitution cannot be measured by aggregating the net liabilities of a failing thrift acquired in a supervisory merger. *See, e.g., Franklin,* 55 Fed.Cl. at 116; *LaSalle,* 317 F.3d at 1376. This court therefore grants defendant summary judgment with regard to

---

**9.** The Federal Circuit on appeal neither approved nor rejected this approach. *Landmark Land Co.*

*v. United States,* 256 F.3d 1365 (Fed.Cir.2001).

plaintiff's claim for restitution based on assumption of net liabilities.

### 2. Restitution claim—calculating benefit using historical data

■ Plaintiff acknowledges that the Federal Circuit in *Glendale* rejected net liabilities as a measure of benefit conferred on the breaching party in *Winstar* cases. 239 F.3d at 1382 ("[T]he action taken by the purchasing S & L in acquiring the failing thrift did not result in the Government ... saving the dollar value of the net obligations of the thrift."). As an alternative restitution calculation, Professor James estimates the savings to the Government by using the Government's actual historical cost in dealing with failing thrifts. Based on this historical data, Professor James concludes that supervisory goodwill, as opposed to the "more traditional resolution method," would equal 70% of the cost of liquidation. James Rpt. 41. Therefore, in order to estimate the Government's benefit under a contract premised on the use of goodwill to meet regulatory guidelines, Professor James applies a 30% discount to the net liabilities of the failing thrifts. This methodology produces an alternative restitution claim of $90.076 million. James Rpt. 41 n. 131 & Ex. V.

This calculation of restitution fails for many of the same reasons as the first. The Federal Circuit in *Glendale* cautioned against using a substitute model to derive a restitution award:

> We recognize the appeal in the restitution approach, but we find that keying an award to a liability that was at most a paper calculation, and which ignores the reality of subsequent events as they impacted on the parties, and particularly on the plaintiff, is not justifiable. Reliance damages will permit a more finely tuned calculation of the actual losses sustained by plaintiff as a result of the Government's breach.

239 F.3d at 1383. Plaintiff's second method for calculating restitution is even more a paper calculation removed from the reality of events as they impacted plaintiff. Plaintiff's calculation ostensibly is rooted in reality because it was gleaned from a mass of historical data. However, the court cannot accept plaintiff's methodology of calculating restitution, no matter how conservative the approach. It is flawed from its inception as lacking a basis in reality, exhibiting a barely discernible association with plaintiff's actual experience. The court therefore grants defendant's motion for summary judgment on plaintiff's restitution claim based on historical data.

### IV. Reliance damages

■ Plaintiff claims damages for the costs that Citizens incurred in reliance on the contracts beginning at the dates of the supervisory merger acquisitions, less the benefits that the bank received under the contracts. Plaintiff presents the expert testimony of Professor James, who concludes: 1) that Citizens incurred significant costs in association with the mergers, and 2) that Citizens incurred those costs only because it received as an offsetting benefit the contractual right to count supervisory goodwill towards its regulatory capital requirement. To calculate the cost of Citizens' reliance damages, Professor James aggregates the net liabilities assumed by Citizens, plus any other consideration paid. Professor James calculates reliance damages at $42.723 million. James Rpt. 26 n. 107 & Ex. F. Plaintiff posits that this sum equals the amount of supervisory goodwill generated in each transaction, which is a proper measure of reliance damages.

Although *Glendale* stated that reliance damages "provide a firmer and more rational basis than the alternative theories argued by the parties[,]" 239 F.3d at 1383, neither *Glendale* nor *Cal Fed* stands for the proposition that the assumption of net liabilities constitutes an appropriate measure of reliance damages. In *Glendale* reliance was calculated by aggregating specific costs, such as increased insurance premiums, increased OTS assessments, transaction costs, custodial fees, and lost historical cost of funds advantage over the bank's competitors. *Id.* Indeed, *Glendale* states that the principle of reliance recognizes that "a party who relies on another party's promise made binding through contract is entitled to damages for *any losses actually sustained* as a result of

the breach of that promise." *Id.* at 1382 (emphasis added).

Plaintiff's calculation does not comport with the prescription set forth in *Glendale.* The court therefore grants defendant's motion for summary judgment with respect to plaintiff's claim for reliance damages.

## V. *Breach claim*

■ Plaintiff also claims what it terms "incidental damages" due to the forced conversion, which is really a claim for damages flowing from the breach of contract. This breach claim is an alternative claim for damages incurred from the premature stock conversion, based on plaintiff's actual performance. Because it does not require plaintiff to use the But-for Bank, this theory does not assume that the Cincinnati division has been restored to Citizens, or that Citizens could use supervisory goodwill as regulatory capital and lever it to acquire income-producing assets. In this scenario the only aspect of reality that plaintiff makes variable is the timing of the stock conversion.

Plaintiff calculates damages caused by the forced conversion based on the difference between the proceeds realized from the actual conversion in 1993 and the proceeds that Citizens would have received had it converted 18 months later. Plaintiff's assumptions as to this delayed conversion date are based on the same reasoning as outlined under the expectancy claim for lost conversion proceeds of the But-for Bank. Mr. Riggins calculated that, had the actual bank been allowed to convert on August 20, 1993, the date of its choosing, the net proceeds would have exceeded those raised by the actual bank by $30.5 million. Riggins Rebuttal ¶ 76.

Plaintiff's claim for these breach damages must be tried, as defendant disputes plaintiff's claim that the FIRREA breach caused Citizens to suffer a loss through a forced premature conversion or that the timing of the conversion was forced. Because the court is constrained not to weigh evidence on a motion for summary judgment, the forthcoming trial will resolve these issues.

During oral argument plaintiff also suggested that it could prove similar breach damages for the loss of the Cincinnati division by extracting the data from its lost profits claim. Such a claim, if it could be proved, would also fall under the category of a breach claim. It would not involve the But-for Bank, but would rely on Citizens' actual performance during the relevant period.

Such claims for breach damages are a proper subject for trial because they meet the standards set out in *Wells Fargo.* The Federal Circuit established three standards for successful breach claims: 1) that the injury be a direct cause of the breach; 2) that the injury be foreseeable at the time of the breach; and 3) that the damages be proved with certainty. 88 F.3d at 1023–24. Under these standards, plaintiff's breach claims for loss of conversion proceeds and loss of the Cincinnati division are not " 'too uncertain and remote' " for consideration by this court at trial. *Id.* at 1023 (quoting *Ramsey,* 121 Ct.Cl. at 435, 101 F.Supp. at 358).

Plaintiff's showing in support of the claim for losses occasioned by the premature conversion is a straightforward breach claim. Plaintiff seeks to prove that the FIRREA breach precipitated this loss, that shrinkage was foreseeable by the parties at the time of contracting, and that the timing of the sale proximately caused the loss to Citizens. Should plaintiff succeed on both this claim and that for the loss of the Cincinnati division, the amounts of its losses can be recovered. However, the court will not award some multiple of those amounts factored into an asset base that has been projected to generate future earnings based on a methodology that can yield only speculative damages, such as plaintiff's claim for lost profits.[10] The court therefore denies defendant's

---

10. Defendant seeks summary judgment on this claim both based on causation, as discussed above, and on duplication of the lost profits claim. Reasoning that plaintiff essentially seeks the *res* representing the total amount of losses, defendant objects to plaintiff's using the losses to augment an asset base that it would project for lost profits. Plaintiff points out that the claim for incidental damages is much greater ($30.5 million) than its claim for lost profits ($25.927 million), which shows that plaintiff seeks only the losses themselves, not the profits that can be

motion for summary judgment with regard to incidental damages, which this court terms a breach claim.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for partial summary judgment is granted with respect to plaintiff's claims for expectancy damages, reliance damages, and restitution. Defendant's motion is otherwise denied.

2. Proof of damages at trial will be limited to plaintiff's claim for breach insofar as FIRREA allegedly caused a forced premature conversion to stock form and the sale of the Cincinnati division.

projected from those losses. The court need not resolve this issue.