SOUTHERN NATIONAL CORPORATION,

and

Branch Banking and Trust Company of South Carolina, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–526C.

United States Court of Federal Claims.

July 16, 2003.

Melvin C. Garbow, Washington DC, for plaintiffs. Howard N. Cayne, David B. Bergman, Michael A. Johnson, and Ida L. Bostian, Arnold & Porter, of counsel.

Paul G. Freeborne, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. John N. Kane, Department of Justice, of counsel.

## OPINION

MILLER, Judge.

Defendant moved for summary judgment as to all the damages claims in this *Winstar* case, *see United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and filed a motion *in limine* requesting the court not to consider certain documents that defendant deems additions to the expert reports that will form the basis of trial testimony. Plaintiffs opposed and cross-moved for summary judgment as to reliance damages and the proper measure of expectancy damages, also moving *in limine* to exclude documents and testimony that they claim constitute inadmissible hearsay. Argument has been held.

### FACTS

The salient facts have been discussed in Judge Wilson's previous opinion. *See Southern Nat'l Corp. v. United States,* 54 Fed.Cl. 554 (2002) (denying cross-motions for summary judgment on liability). The undisputed facts that are material to resolving the cross-motions for summary judgment and the motions *in limine* are recited below.

First Federal Savings and Loan Association, a federally chartered thrift located in Greenville, South Carolina, absorbed nine failing thrifts between 1981 and 1983. The suit at bar involves the acquisition of four of these thrifts: 1) Lexington County Savings and Loan Association of West Columbia, South Carolina; 2) State Savings and Loan Association of Walterboro, South Carolina; 3) Chester Savings and Loan Association of Chester, South Carolina; and 4) Standard Savings and Loan Association of Lancaster, South Carolina.[1]

All four acquisitions were unassisted, which means that the Government provided no cash inducement for First Federal to obtain the failing institutions. Each acquisition employed the purchase method of accounting under generally accepted accounting principles ("GAAP"), which allowed First Federal to recognize the excess of the purchase price over the market value of identifiable assets acquired as an intangible asset known as supervisory goodwill.[2] First Federal

---

1. The details of the acquisitions are described in detail at *Southern National,* 54 Fed.Cl. at 555–56.

2. First Federal accounted for the remaining five transactions, which are not included in this lawsuit, with the pooling method under GAAP.

planned to amortize the goodwill over a period of 40 years (later modified to 35 years).

The Federal Home Loan Bank of Atlanta conditionally approved the four acquisitions by letters, each of which contained the conditions necessary for final approval of the acquisition by the Federal Home Loan Bank Board ("FHLBB") in Washington, DC. The parties did not memorialize the terms of the transactions in formal supervisory action agreements, resolutions, or documents subject to integration clauses. After First Federal submitted the required information, FHLBB approved the four transactions at issue in this case. The four acquisitions generated a combined total of approximately $42 million in supervisory goodwill, which, pursuant to the regulatory regime in existence at the time, First Federal was permitted to book toward its capital requirements.

The parties dispute the extent to which the acquisitions benefitted First Federal. They concur that, owing to a decrease in interest rates, First Federal was able to sell approximately $80 million in acquired loans in fiscal year 1983 for a gain of $12.5 million. Defendant asserts that First Federal obtained $15.5 million in tax benefits from the four acquisitions, but whether this benefit is traceable to the transactions at issue is contested.

In 1989 Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). *See generally* Pub.L. No. 101–73, 103 Stat. 183. The statute established new categories of regulatory capital: tangible capital, core capital, and risk-based capital. FIRREA's new tangible capital requirement prevented thrifts from counting goodwill as an asset. The act also phased goodwill out of the new core capital and risk-based capital standards.

*See Winstar*, 518 U.S. at 856–57, 116 S.Ct. 2432.

Despite the more stringent capital requirements imposed by FIRREA, First Federal was in capital compliance at the end of each reporting period through September 1993. On December 15, 1993, First Federal converted from mutual to stock form. The company had completed its secondary stock offering on June 2, 1986, selling 1.3 million shares of common stock. The parties disagree as to the amount of profit earned and the amount of issuance costs incurred during First Federal's secondary stock offering and as to the appropriateness of issuance costs as a cap on expectancy damages.

On January 28, 1994, First Federal merged into Southern National Corporation, a commercial bank in Lumberton, North Carolina. Under guidelines established by the Office of the Comptroller of the Currency, Southern National, as a commercial bank, could not count supervisory goodwill as a component of regulatory capital. Thus, the bank wrote off the remaining supervisory goodwill when it acquired First Federal.[3] In 1995 Southern National merged with Branch Banking and Trust Company.[4] On August 8, 1995, Southern National and Branch Banking ("plaintiffs") brought suit in the Court of Federal Claims principally for breach of contract and an uncompensated taking of their property to recover damages that, they contend, the passage of FIRREA caused.[5]

## DISCUSSION

### I. *Standards for summary judgment*

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

**3.** First Federal held $28.75 million in goodwill as of June 30, 1993.

**4.** At the time the complaint was filed, Southern National and Branch Banking were related corporate entities. After its merger with Branch Banking, Southern National ceased to exist independently. *See Southern Nat'l*, 54 Fed.Cl. at 555 n. 1. For the purposes of this opinion, the court refers to both Southern National and Branch Banking as "plaintiffs."

**5.** This breach-of-contract suit is one of many filed in the Court of Federal Claims which had their genesis in the savings and loan crisis of the 1980s and the Government's responses to that crisis. The Supreme Court offered a thorough account of this litigation in *Winstar*, 518 U.S. at 844–58, 116 S.Ct. 2432.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine issue of material fact exists when a rational trier of fact could arrive only at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996).

In the 1986 trilogy—*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson;* and *Matsushita*—the Supreme Court reminded that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1). Having given careful consideration to the large volume of submitted materials, the court has no doubt that the parties have supplied it with more than sufficient information to make summary judgment appropriate, assuming that either party has proved its entitlement thereto as a matter of fact and law. *See* RCFC 56(c).

## II. *Defendant's motion for summary judgment*

Defendant has moved for summary judgment with respect to all of plaintiffs' damages theories, to the end that entry of judgment is sought in its favor. Plaintiffs claim reliance damages, wounded bank damages, and expectancy damages in the form of First Federal's lost profits, lost value, and cost of replacing the supervisory goodwill eliminated by FIRREA. The court addresses each theory in turn.

### 1. *Reliance damages*

Plaintiffs' expert S. Lynn Stokes presents a reliance calculation that purports to measure the cost that First Federal incurred in entering the four acquisitions at issue, taking into account any benefit that the institution received from the supervisory goodwill. *See* Expert Rpt. of S. Lynn Stokes, July 12, 2001, ¶ 41 ("Stokes Rpt."). To determine First Federal's gross cost, Mr. Stokes totaled the liabilities assumed by First Federal in the acquisitions and then subtracted the value of the tangible acquired assets, thereby calculating the extent to which it "overpaid" for the four thrifts. *Id.* ¶¶ 42–45.

To calculate First Federal's net cost, Mr. Stokes first computed the value that the thrift received from the acquisitions by determining what it would have paid to acquire the same dollar amount of liabilities in so-called "market transactions," *i.e.*, transactions involving no supervisory goodwill. Stokes Rpt. ¶¶ 47–53. After subtracting the dollar amount of this figure from First Federal's gross cost, Mr. Stokes had a total of $32.5 million. *Id.* ¶ 54.

Mr. Stokes then deducted from the $32.5 million the benefit attributable to the Government's "partial performance," *i.e.*, the supervisory goodwill that First Federal counted towards its regulatory requirements from 1982 to 1989 and the supervisory goodwill that First Federal booked toward its risk-based capital requirement from 1990 to 1994. Stokes Rpt. ¶¶ 56–57. He calculated the ratio of total capital to goodwill for each fiscal year and applied that ratio to First Federal's annual earnings in order to determine the percentage of earnings attributable to goodwill. *Id.* ¶ 58. After totaling the annual profits attributable to goodwill, he subtracted this figure from the $32.5 million, with $17.2 million as First Federal's net initial cost. *Id.* ¶ 60. Finally, Mr. Stokes added $5.1 million in opportunity costs, yielding a reliance claim of $22.3 million.[6] *Id.* ¶ 67.

Defendant contends that Mr. Stokes's reliance calculation is contrary to the Federal Circuit's repeated admonition that the assumption of net liabilities cannot properly be considered a cost of acquisition. Moreover, defendant argues that plaintiffs' reliance calculation is "fatally flawed" because it assumes that, in the absence of the four supervisory acquisitions, First Federal "could (and

---

**6.** This figure is incorrectly reported as $22.4 million in Mr. Stokes's report.

would) have done some group of transactions that would have provided exactly the same (or even greater) benefits, at the same cost as the cost of these four transactions." Def.'s Br. filed Jan. 24, 2003, at 22. Plaintiffs, in what defendant deems an "attempt to reverse field," Def.'s Br. filed Mar. 25, 2003, at 2, characterize Mr. Stokes's reliance calculation as determining the "*excess premium* First Federal paid, recognizing that First Federal's recoverable cost is *substantially less* than the net liabilities assumed." Pls.' Br. filed Feb. 25, 2003, at 44; *see also* Pls.' Br. filed Apr. 11, 2003, at 29. This, according to plaintiffs, distinguishes Mr. Stokes's reliance calculation from those rejected by the Federal Circuit and the Court of Federal Claims in other *Winstar* cases.

■ Reliance damages are intended to compensate a party that sustained actual losses as a result of the other party's breach. *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1382–83 (Fed.Cir.2001). The Federal Circuit in *Glendale* endorsed the use of reliance calculations in a *Winstar* setting, advising that this measure of damages "will permit a more finely tuned calculation of the actual losses sustained by plaintiff as a result of the Government's breach." *Id.* at 1383. However, the court repeatedly has rejected damages calculations that, like the one presented by Mr. Stokes, rely on a formula whereby the cost of performance is measured by the net liabilities of the target thrift.[7] *See id.* at 1381–83; *see also LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1376–77 (Fed.Cir.2003); *California Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1351–52 (Fed.Cir.2001) ("*CalFed*").

■ The Federal Circuit rejected net liabilities as an appropriate assessment of the acquiring thrift's damages because they are " 'at most a paper calculation.' " *LaSalle Talman,* 317 F.3d at 1376 (quoting *Glendale,* 239 F.3d at 1382–83). In *Glendale* the court detailed the difficulty of assessing the cost of

acquiring a failing thrift, finding that "the action taken by the purchasing [thrift] in acquiring the failing thrift did not result in the Government ... saving the dollar value of the net obligations of the thrift." 239 F.3d at 1382. Because the Government retained the contingent liability that, if the merged institution fell out of capital compliance, it may have to assume the institution's losses, what the Government received from the acquisition was, in essence, time to see if the new thrift survived. Thus, the court concluded that keying an award to the net liabilities assumed was too "speculative and indeterminate" to satisfy the requirements for reliance damages. *Id.; see also Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223, 245–46 (2003) (rejecting reliance calculation premised on net liabilities assumed in supervisory transaction because "[p]laintiff's calculation does not comport with the prescription set forth in *Glendale* ").

Arguing that Mr. Stokes's calculation is nevertheless viable, plaintiffs filed a motion to notify the court of *Citizens Financial Services, FSB v. United States,* 57 Fed.Cl. 64 (2003). Plaintiffs maintained that, because the *Citizens* court denied summary judgment with respect to a reliance calculation that, like Mr. Stokes's, was based on the net liabilities assumed in the transactions at issue, this court should allow Mr. Stokes's formulation to proceed to trial. *See* 57 Fed.Cl. at 69–71.

This court respectfully must disagree with the *Citizens* court's analysis of reliance damages in a *Winstar* setting. The *Citizens* court reads *Glendale* to provide a non-exclusive list of factors to consider in determining reliance damages and concludes that "reliance damages may be based on the assumption of net liabilities in appropriate cases." 57 Fed.Cl. at 70–71. The court cites *Franklin, FSB v. United States,* 55 Fed.Cl. 108, 120–21 (2003), as supporting the interpretation that assumed net liabilities may provide

---

7. The damages awards reviewed in *LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1376–77 (Fed.Cir.2003); *California Federal Bank, FSB v. United States,* 245 F.3d 1342, 1351–52 (Fed.Cir.2001) ("*CalFed* "); and *Glendale,* 239 F.3d at 1380–81, were premised, in part, on the theory of restitution. However, the Federal Cir-

cuit specifically has extended the applicability of its restitution analysis to reliance calculations, holding that "[w]hen restitution ... [is] based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages ...." *LaSalle Talman,* 317 F.3d at 1376.

the predicate for recoverable reliance damages.

First, as discussed above, the *Glendale* court ruled that a restitution award could not be premised on the principle that plaintiff thrift conferred a benefit on the Government in an amount equal to the assumed net liabilities of the acquired institution. 239 F.3d at 1381–82. In *CalFed* the appeals court, on the same grounds cited in *Glendale,* affirmed the denial of a restitution claim identical to the one rejected in *Glendale.* 245 F.3d at 1351–52. In *LaSalle Talman,* the Federal Circuit stated that restitution, when premised on the recovery of costs expended by the non-breaching party in performing the contract, "can be viewed as a form of reliance damages." 317 F.3d at 1376.

Thus, this court interprets the Federal Circuit's prohibition against premising a restitution award on assumed net liabilities as applying with equal force to a reliance calculation based on the same principle. The *Citizens* court does not address *LaSalle Talman* in its analysis of plaintiff's reliance calculation, and *Franklin* was decided one week before the appeals court issued *LaSalle Talman.* Both cases, therefore, do not take the Federal Circuit's recent guidance into account; consequently, the approaches endorsed by these trial court decisions are not persuasive authority.

In addition to being premised on assumed net liabilities, Mr. Stokes's reliance model also assumes that, were the four supervisory transactions not performed, First Federal would have engaged in hypothetical transactions of equivalent economic value. However, Mr. Stokes fails to "provide an explanation of why the hypothetical market transactions would in any way be economically equivalent to the four mergers at issue in this case." Def.'s Br. filed Mar. 25, 2003, at 32. Speculation of this nature fails the Federal Circuit's mandate that reliance damages measure the actual losses sustained by the non-breaching party. *See Glendale,* 239 F.3d at 1382.

Accordingly, defendant's motion for summary judgment as to Mr. Stokes's reliance claim is granted.

2. *Non-overlapping reliance damages (wounded bank costs)*

Mr. Stokes also presents four categories of damages that he characterizes as "non-overlapping reliance costs." Stokes Rpt. ¶ 68. These categories, known as wounded bank damages in *Winstar* litigation, include the following expenditures allegedly incurred by First Federal after the enactment of FIRREA: 1) $6.7 million to attract deposits in the wake of adverse publicity regarding FIRREA; 2) $800,000.00 to compensate for the time management spent devising methods to stay in capital compliance; 3) $1.3 million to securitize portions of its residential loan portfolio to reduce the portfolio's risk; and 4) $2.8 million to stay in capital compliance, as measured by the loss incurred from the forced sale of real estate developments. *Id.* ¶¶ 69(A)-(D).

Defendant insists that plaintiffs have not shown that FIRREA's implementation was the proximate cause of the rise in cost of funds or the impetus for the loan securitization. Defendant also argues that the remaining wounded bank costs are speculative and not supported by contemporaneous documentary evidence. Plaintiffs dispute that these claims lack sufficient evidentiary support, pointing to documents and deposition testimony to support all four cost categories.

The Federal Circuit has recognized wounded bank costs as a viable theory of reliance damages, as long as plaintiff can show that the claimed costs are directly traceable to the alleged breach. *See Glendale,* 239 F.3d at 1383; *CalFed,* 245 F.3d at 1352 n. 1. Plaintiff thrifts in the Court of Federal Claims, however, have had mixed success in recovering these costs. In *Glendale* the trial court awarded wounded bank costs after trial for, *inter alia,* increased deposit insurance premiums, increased Office of Thrift Supervision assessments, and custodial fees paid to bank regulators. Plaintiff thrift argued that it had incurred these costs when forced to comply with regulatory action after failing to meet FIRREA's risk-based and core capital requirements. The trial court based its award on the testimony of plaintiff's expert and officers, who explained

that plaintiff had a ten-year cost-of-funds advantage over its competitors before falling out of capital compliance, that it would not have fallen out of capital compliance but for the Government's breach, and that a logical response to falling out of compliance is to raise rates. Plaintiff in *Glendale* also was able to show that it suffered increased assessments and custodial fees as a result of the breach and its subsequent failure to maintain capital compliance.[8]

The trial court in *CalFed* reached the opposite conclusion, finding that plaintiff "cannot establish a connection between defendant's breach of the contract and plaintiff's costs of deposits, costs of borrowing, or regulatory assessments sufficient to find causation."[9] *California Fed. Bank, FSB v. United States*, 43 Fed.Cl. 445, 457 (1999), *aff'd in part, vacated in part, and remanded*, 245 F.3d 1342 (Fed.Cir.2001). The court did not credit plaintiff's expert or lay testimony on the wounded bank costs, including that provided by plaintiff's executive vice president. The vice president speculated that the enactment of FIRREA precipitated deposit outflows, but could not give an estimate of how many deposits were lost and based this testimony on his memory alone. The court concluded that "[s]uch testimony does not provide a basis for awarding damages." *Id.*

In *Coast Federal Bank, FSB v. United States*, 48 Fed.Cl. 402 (2000), *aff'd en banc*, 323 F.3d 1035 (Fed.Cir.2003), the court rejected on summary judgment the increased deposit cost component of plaintiff's wounded bank damages. Plaintiff, like Mr. Stokes in the case at bar, argued that the negative publicity surrounding FIRREA forced plaintiff to offer depositors higher rates to overcome reports of the thrift industry's poor condition. In support of its claim, plaintiff submitted dozens of press clippings, but some of these articles attributed plaintiff's losses to factors unrelated to the enactment of FIRREA. Moreover, other articles placed a positive spin on plaintiff, and some of the negative press was written before Congress passed FIRREA. Therefore, the "total negative impact of those articles ... must be viewed as minimal." 48 Fed.Cl. at 438.

Plaintiff's other evidence also failed to raise a genuine issue of fact as to causation. The court found that the testimony of various regulators did not establish the requisite causal nexus between FIRREA and the increased cost of deposits. The affidavit submitted by plaintiff's vice president consisted only of "conclusory assertions." 48 Fed.Cl. at 438. Finally, plaintiff could not support its costs by sponsoring a study which simply showed a "general association" between undercapitalization and high deposit costs.[10] *Id.*

To complement the factual predicates of Mr. Stokes's expert report, plaintiffs rely on Mason Alexander, First Federal's Retail Banking Group Manager, who gave the following testimony at deposition:

> QUESTION: Following the passage of FIRREA, was there any increased or greater run-off of deposits that you recall?
>
> ANSWER: I have a general feeling that we had to pay more to retain deposits but I cannot answer you [any more] than that.... We're talking about something that is virtually ten years old.

Dep. of Mason Alexander, Aug. 22, 2000, at 64 ("Alexander Dep."). This testimony does not create a genuine issue of disputed fact. It is virtually identical to that found in *CalFed* to be insufficient to stave off sum-

---

**8.** The Federal Circuit appeared not to address the merits of the wounded bank damages in its opinion, and the trial court reinstated these damages on remand, finding that they "meet the criteria that the Federal Circuit has laid out: they are actual, ascertainable damages suffered by plaintiff as a result of the breach." *Glendale Fed. Bank, FSB v. United States*, 54 Fed.Cl. 8, 14 (2002).

**9.** Plaintiff did not challenge the trial court's ruling on wounded bank damages on appeal. *See CalFed*, 245 F.3d at 1352 n. 1.

**10.** The court denied defendant's summary judgment motion as to plaintiff's other wounded bank claims—including higher insurance premiums, rates on advances, and operating assessments—because the requisite causal link existed: "[T]hese increased costs are attributable to unfavorable assessments of plaintiff by regulators, and ... undercapitalization was a factor in those unfavorable assessments." 48 Fed.Cl. at 440.

mary judgment and is merely a general statement rendered suspect by the witness's own disclaimer. The Federal Circuit recently approved of a trial court's rejection of testimony, offered in opposition to summary judgment, that was clouded by the passage of time. *See D & N Bank, FSB v. United States,* 331 F.3d 1374, 1379 n. 4 (Fed.Cir. 2003).

As to documentary evidence, Mr. Stokes based his increased deposit cost calculation on First Federal's 1990 and 1991 annual reports. The 1990 annual report attributes the reduction in core operating earnings "as discussed in last year's report," to, in part, "the negative publicity about certain segments of the industry." Management estimated that the negative publicity "added another .25% increase ... to the price of deposits." The prior year's report—covering the 1989 fiscal year, which ended before the enactment of FIRREA—stated that "[m]anagement estimates the negative publicity relating to the recapitalization of the federal deposit insurance programs added another .25% increase to the price of deposits ...." Thus, as in *Coast,* plaintiffs' documentation fails to establish that FIRREA's implementation caused First Federal's cost of deposits to rise, as the "negative publicity" necessitating an increase in deposit costs pre-dated the passage of FIRREA. Plaintiffs have not presented sufficient evidence to avoid summary judgment on this claim.

■ The next wounded bank cost claimed by plaintiffs is the price of management time devoted to dealing with the changes implemented by FIRREA. Defendant argues that "no contemporaneous documents exist that allow the plaintiffs to make such a claim." Def.'s Br. filed Jan. 24, 2003, at 50. It is true that plaintiffs marshal no documents in their favor, but they have the deposition testimony of Milton Futch, First Federal's Chief Financial Officer. Mr. Futch testified, as follows:

FIRREA forced us to be more stringent, to figure ways to increase income because we had to meet that five year phase-in period. And we did not do some things that we would liked to have done or would have done or been done in the best interests of the business ....

Dep. of Milton Futch, Aug. 26, 2000, at 33–34. Plaintiffs also point to Mr. Alexander's testimony that the implementation of FIRREA "was a constant source of concern of management. And it effected [sic] management's decision." Alexander Dep. at 45.

As with the increased deposit cost claim, plaintiffs have offered nothing more than speculative testimony that fails to raise a disputed factual issue concerning the necessary connection between the cost and the alleged breach. This claim cannot survive a motion for summary judgment.

■ Turning next to plaintiffs' loan securitization claim, defendant contends that the deposition testimony of H. Ray Davis, First Federal's Chief Executive Officer, shows that First Federal undertook no action post-FIRREA to ensure capital compliance. Defendant questioned Mr. Davis during his deposition:

QUESTION: Did First Federal shrink its assets following the passage of FIRREA to ensure that it was in compliance with the FIRREA capital standards?

ANSWER: Not to ensure compliance with FIRREA ....

....

QUESTION: To your knowledge, did First Federal take any action following the passage of FIRREA that were [sic] intended to ensure that First Federal was in compliance with the capital standards imposed by FIRREA?

ANSWER: The only action that would be taken, would be the normal action in the course of doing business....

Dep. of H. Ray Davis, July 10, 2000, at 238–40.

Although Mr. Davis's testimony appears to support defendant's contention, plaintiffs have presented other evidence that warrants a trial on First Federal's claim for increased loan securitization costs. In its 1990 annual report, First Federal management stated that "ARM [adjustable rate mortgages] loans will also be securitized as needed to meet the more stringent regulatory risk-based capital requirements under FIRREA." First Federal's Strategic Business Plan, covering the

period from January 1, 1990, to June 30, 1994, included a goal of securitizing fixed rate mortgage loans, consumer loans, and "mortgage loans not usually securitized such as ARMs" in order to reduce First Federal's risk-based capital requirement. Finally, Robert H. Painter, First Federal's Senior Vice–President and Investment Officer, testified that the securitization of mortgage loans was performed "solely to help capital compliance." Dep. of Robert H. Painter, July 18, 2000, at 208. Unlike plaintiffs' claims for increased deposit and management costs, their wounded bank claim for the cost of loan securitization withstands summary judgment.

█ Finally, Mr. Stokes presents the claim that plaintiffs are entitled to compensation for the forced sale of First Federal's real estate developments. Defendant again urges that this component of wounded bank damages is unsupported by any evidence. Plaintiffs argue that statements in First Federal's business plan and annual reports link the sale of real estate to maintaining the capital positions required by FIRREA. The thrift's Strategic Business Plan included a strategy of downsizing First Federal's real estate development activities in order to minimize its risk-based capital requirement. First Federal's 1992 annual report attributed an increase of $1.2 million in real estate losses to First Federal's "concentrated effort to reduce the real estate required for development and resale operations ... since a deduction from capital is required in the [Office of Thrift Supervision] capital regulations." In the 1993 report, First Federal's management noted that it was attempting to downsize the thrift's real estate holdings, but no explanation is given for this action. However, drawing all reasonable inferences in plaintiffs' favor, the court deems this component of plaintiffs' wounded bank costs sufficient to withstand summary judgment.

Accordingly, defendant's motion for summary judgment is granted as to plaintiffs' claims for increased deposit costs and management costs and denied as to plaintiffs' claims for loan securitization costs and losses sustained from the forced sale of real estate.

### 3. *Expectancy damages*

#### 1) *Lost profits*

Mr. Stokes also proposes to testify about a lost profits model of damages that purports to measure First Federal's lost profits from 1990 to 2017, which, absent FIRREA's implementation, would have been the final year of the 35–year amortization period. Stokes Rpt. ¶¶ 25, 33. The expert's theory hinges on his assumption that First Federal's lost profits could be determined by calculating the return on assets that First Federal would have earned absent the passage of FIRREA. *Id.* ¶ 26. To predict how First Federal would have operated in this "but-for" world, Mr. Stokes determined the amount of supervisory goodwill that remained on First Federal's books at the time of FIRREA's enactment and amortized this goodwill over the remaining 35–year period. *Id.* ¶ 28. Taking this "additional regulatory capital that would have been available to support First Federal's additional growth," Mr. Stokes then calculated the return on average assets ("ROAA") that First Federal would have earned in the but-for world. *Id.* ¶ 29. For the years prior to First Federal's acquisition by Southern National, Mr. Stokes applied the "conservative assumption that First Federal would have earned the same ROAA on the incremental assets as it earned in its actual operations, adjusting for the amortization of goodwill." *Id.* ¶ 30 (footnote omitted). For the years after 1993 (when First Federal ceased to exist as an independent corporate entity), Mr. Stokes applied the ROAA First Federal achieved in 1993, adjusted for the amortization expense. *Id.* ¶ 31.

Mr. Stokes next determined the amount of incremental assets that First Federal would have acquired absent FIRREA by constructing a "leverage ratio" based on First Federal's historic performance. Stokes Rpt. ¶ 32. By multiplying the return on First Federal's hypothetical assets by the amount of assets obtained in the but-for world, Mr. Stokes concluded that $31.789 million was the "minimum amount of First Federal's actual lost profits." *Id.* ¶ 36. After he discounted this amount and converted it to pre-tax form, Mr. Stokes concluded that First Federal's lost

profits resulting from the passage of FIR-REA totaled $52.77 million. *Id.* ¶ 39.

Defendant challenges plaintiffs' damages for lost profits as not reasonably foreseeable, caused by FIRREA, or proved with reasonable certainty. *See Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348, 1355–56 (Fed. Cir.2001). Defendant also characterizes Mr. Stokes's lost profits calculation as identical to the one rejected by this court in *Fifth Third. See* 55 Fed.Cl. at 236–42. Plaintiffs rejoin that Mr. Stokes's calculation satisfies the standards governing expectancy damages and contend that Mr. Stokes's theory is distinguishable from the *Fifth Third* lost profits model. Alternatively, plaintiffs suggest that the decision in *Fifth Third* is contrary to Federal Circuit and Court of Claims precedent excusing a claimant from providing a detailed account of its investments in a but-for world when a "reasonable probability of damage" can be established. *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960).

■■■ The goal of expectancy damages is to give the non-breaching party the benefit it expected to receive had the breach not occurred. *See Glendale,* 239 F.3d at 1380.

" 'If the [lost] profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages . . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, . . . then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.' "

*Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 358 (1951) (quoting *Myerle v. United States,* 33 Ct.Cl. 1, 26, 1800 WL 2024 (1897)) (cited with approval in *Wells Fargo Bank v. United States,* 88 F.3d 1012, 1022–23 (Fed.Cir.1996)). Lost profits thus may be awarded " 'where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.' " *CalFed,* 245 F.3d at

1349 (quoting *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961)).

■■■ The Federal Circuit had occasion to analyze the grant of summary judgment as to a lost profits claim in *CalFed.* Plaintiff bank submitted specific documentation of over 20,000 single-family adjustable mortgages that it sold to remain in capital compliance after FIRREA. Its expert traced the actual post-sale performance of these loans to arrive at a lost profits figure. Further, plaintiff proffered evidence that FIRREA's tightened capital requirements forced it to sell a profitable business unit to remain in regulatory compliance. The record included evidence of "past performance, [plaintiff's] pre-breach business plans, data on the performance of other thrifts in the post-breach period, and historical evidence of assets that [plaintiff] allegedly had to sell to remain in capital compliance." 245 F.3d at 1350. Plaintiff therefore had submitted "considerable evidence, including expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits." *Id.*

After canvassing binding authority on the issue of lost profits, this court in *Fifth Third* rejected a calculation almost identical to the one presented by Mr. Stokes. 55 Fed.Cl. at 242. Dr. R. Daniel Brumbaugh, plaintiff's expert in *Fifth Third,* measured plaintiff's lost profits by determining "the product of the incremental assets and the incremental return that the But-for Bank would have earned." *Id.* at 228. Dr. Brumbaugh based his predictions on plaintiff's past performance, but did not identify any business opportunities that plaintiff would have pursued, any markets that it would have exploited, or any particular type of investment to which it would have allocated assets in the but-for world. Dr. Brumbaugh was not faulted for failing to name names; rather, unlike the evidence that was presented to the Federal Circuit in *CalFed,* he did not identify any type or category of activity, opportunity, or investment.

While acknowledging that, after *CalFed,* "it would be the *rara avis,* indeed, that could merit summary judgment," the trial court in

*Fifth Third* interpreted *CalFed* "as reinforcing established jurisprudence on summary judgment and not stating a rule applicable to all *Winstar* cases." *Fifth Third,* 55 Fed.Cl. at 236. Whereas in *CalFed* plaintiff was able to trace the profitability of specific assets that it was required to sell to stay in capital compliance, Dr. Brumbaugh simply assumed that "the But–for–Bank would ... engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged." *Id.* at 241. Moreover, Dr. Brumbaugh failed "to account for any real-world events" and ignored "the presence of competitors similarly unfettered by the breaching provisions of FIRREA." *Id.* Accordingly, the court found Dr. Brumbaugh's calculation speculative as a matter of law and granted defendant's motion for summary judgment as to plaintiff's lost profits claim. *Id.* at 241–42.

Mr. Stokes's model suffers from the same infirmities as Dr. Brumbaugh's. When asked if First Federal's business practices would change in the but-for world, he answered:

> [I]t's difficult to divine what the company might have done in a nonbreach world in terms of changing the way it did business.... [W]hat I've done is make what I believe to be the most reasonable and reliable assumption, and that is, that the company would not have been operated materially differently in the nonbreach world. It would have just been a larger company.

Dep. of S. Lynn Stokes, Nov. 27, 2001, at 138–39 ("Stokes Dep."). Mr. Stokes admitted that his calculation "assumes that the assets obtained at the margin would mirror the asset composition of First Federal taken as a whole." *Id.* at 130.

As in *Fifth Third,* plaintiffs have projected lost profits using past experience as a predictor of future performance, as opposed to a model reflecting categories of activities, opportunities, or lines of businesses that the thrift would have undertaken in the but-for world. During oral argument plaintiffs' counsel, in an effort to distinguish Mr. Stokes's lost profits analysis from Dr. Brumbaugh's, pointed out that Mr. Stokes's calculation employed an ROAA "that's less than the return on assets First Federal projected itself to make in its contemporaneous business plans." Transcript of Proceedings, *Southern Nat'l Corp. v. United States,* No. 95–526C, at 68 (Fed. Cl. June 19, 2003) ("Tr."). The invocation of First Federal's business plan does not save Mr. Stokes's analysis. Although the plan describes the thrift's financial goals for the period between 1990 and 1994, it does not identify any investment opportunities that First Federal would have pursued in the but-for world that were prohibited by FIRREA. Moreover, the fact that Mr. Stokes was conservative in projecting First Federal's ROAA does not correct for the fact that his only factual predicate is that the thrift will enjoy continued growth. *See Fifth Third,* 55 Fed.Cl. at 241.

Mr. Stokes, like Dr. Brumbaugh, also did not factor the element of competition into his calculation. He did not believe that competition from other banks "would have [made] a substantial difference" in the way First Federal obtained additional assets, so his lost profits calculation does not take competition into account.[11] Stokes Dep. at 140. Mr. Stokes assumed that First Federal would leverage goodwill in a manner that would mimic its historical performance and that the return on the assets acquired would parallel the thrift's past earnings. Ultimately, Mr. Stokes's model is speculative and does not conform with the parameters governing the grant of expectancy damages.

Plaintiffs seek to avoid the ruling in *Fifth Third* by arguing that the grant of summary judgment was based on Dr. Brumbaugh's deposition testimony only. *See* Pls.' Br. filed

---

11. Plaintiffs' counsel at oral argument presented the novel theory that First Federal's presence as a "small player in a very, very large and liquid market" obviated the need for Mr. Stokes to account for competition in his lost profits calculation. Transcript of Proceedings, *Southern Nat'l Corp. v. United States,* No. 95–526C, at 72 (Fed. Cl. June 19, 2003) ("Tr."). Plaintiffs have offered no evidence to support this theory, and the court does not credit it, either as a matter of fact or of common sense.

Feb. 25, 2003, at 40. *Fifth Third* was based on the Federal Circuit's decision in *CalFed* and the standard set by the case law governing expectancy damages. *See* 55 Fed.Cl. at 241–42. Although Dr. Brumbaugh's deposition testimony was cited, his report was evaluated against binding legal authority and found wanting.

Plaintiffs alternatively argue that *Fifth Third* was decided contrary to Federal Circuit and Court of Claims binding precedent on lost profits as a measure of damages. The holdings in *Energy Capital Corp. v. United States,* 302 F.3d 1314 (Fed.Cir.2002); *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329 (Fed.Cir.2000); and *Locke,* 283 F.2d 521, are cited for the proposition that plaintiffs in these cases were not required to submit detailed evidence of a but-for world. Plaintiffs fail to mention that the Court of Claims and, later, the Federal Circuit, have adhered to a basic tenet governing expectancy damages: A claimant must present sufficient evidence to prove that the amount of its lost profits was reasonably certain. *See Energy Capital,* 302 F.3d at 1325. The Federal Circuit in *Energy Capital* affirmed an award of lost profits after the Government breached its contract with plaintiff to allow an extension of a certain type of loan. Because the Government canceled the program authorizing the loans, the trial court awarded plaintiff lost profits based on plaintiff's subsequent inability to extend the loans. The Federal Circuit affirmed because the lost profits flowed directly from the contract and because the loan market was well defined, thereby enabling the court to determine plaintiff's profits in the but-for world. *Id.* at 1328–29.

In *Ace–Federal* plaintiffs sued for lost profits when the Government purchased transcription and court-reporting services from contractors that were not parties to plaintiffs' contract with the Government for these services. In analyzing their lost profits claim, the Federal Circuit turned to *Locke;* that case involved a wrongfully terminated contractor that had been removed from a federal supply schedule that listed companies from which most government agencies were required to purchase typewriter repair services. The Court of Claims in *Locke* grounded recoverable lost profits on "evidence bearing specifically" on plaintiff's claim. 283 F.2d at 525 (cited with approval in *Ace–Federal,* 226 F.3d at 1332). The *Locke* court then remanded to the trial commissioner to determine, *inter alia,* the total amount of typewriter repair business for which plaintiff would have been eligible under the contract and the average per-unit cost in performing the repair work. These amounts could be determined because plaintiff was one of four companies awarded the contract; thus, the market for such repairs was known. In *Ace–Federal* the Federal Circuit came to a similar conclusion, stating that the "relevant factors" governing plaintiffs' lost profits claim included the total amount of business for which each plaintiff would have been eligible and the average expense incurred in fulfilling the contractual obligations. Again, because plaintiffs were part of a small group of businesses awarded the contract, the market for their services was known.

Mr. Stokes's lost profits model does not operate in such a known market, and it does not attempt to customize the but-for world by identifying types or categories of investment opportunities that First Federal would have exploited or by recognizing competition. Accordingly, defendant's motion for summary judgment as to Mr. Stokes's lost profits calculation is granted.

### 2) *Monte Carlo model of First Federal's lost value*

■ Plaintiffs' expert Dr. Roger C. Kormendi offers two damages theories: a measure of First Federal's lost value, as calculated by a multi-path simulation technique referred to as the Monte Carlo model, and a hypothetical calculation of the cost of replacement capital. Dr. Kormendi explains that the lost value approach to expectancy damages measures the "reduction in the value of First Federal's business opportunity" effected by the passage of FIRREA. Expert Rpt. of Roger C. Kormendi, July 18, 2001, ¶ 18 ("Kormendi Rpt."). To measure this reduction in value, Dr. Kormendi employed his Monte Carlo model to forecast the "large number of possible performance

paths," both in the real and the but-for worlds, for First Federal's book equity between 1989 and 1999. *Id.* ¶¶ 23–24. He then averaged the predicted performances in the real world and those in the but-for world; the difference between these two averages, according to Dr. Kormendi, was the value of the business opportunity lost to First Federal by the enactment of FIRREA. *See id.* ¶¶ 17, 73–75. Dr. Kormendi estimated that this value equaled $23.1 million. *Id.* ¶ 79.

The parties expressed sharply divided opinions as to the legal viability of the Monte Carlo model. Defendant interprets Dr. Kormendi's model to measure the immediate drop in First Federal's equity value after the passage of FIRREA in 1989, concluding that First Federal's equity value is equivalent to its lost profits. *See* Tr. at 34–35. As a measure of lost profits, defendant argues that Dr. Kormendi's calculation suffers from the same problems as the model presented by Mr. Stokes: lack of causation, foreseeability, and reasonable certainty. *Id.* at 33–34. Plaintiffs retort that Dr. Kormendi's theory is not a lost profits model; rather, the model calculates the value of the "option to remain open and operating, with the benefits of deposit insurance." *Id.* at 84; *see also* Kormendi Rpt. ¶ 9 ("First Federal contracted with the government to obtain a highly valuable option to continue to operate (with the benefits of government deposit insurance) ...."). Defendant observes in response that plaintiffs seek to rechristen Dr. Kormendi's lost profits theory to avoid its infirmities.

Plaintiffs and defendant present the most polarized arguments regarding the contention that Dr. Kormendi's theory measures the put option value of First Federal's subsidized deposit insurance. This option represents the value of being able to call on deposit insurance. Defendant argues that Dr. Kormendi's Monte Carlo model does not measure such an option and characterized put option theories in general as "irrelevant and repugnant." Def.'s Br. filed Mar. 25, 2003, at 12. According to defendant, the put option, as formulated by plaintiffs, allows a thrift's equity holders to engage in a "heads I win, tails you lose" gamble, in which risky

investment decisions, if successful, would create a windfall for the thrift's owners; however, if the decisions drove the thrift to insolvency, the Government and taxpayers would be left holding the bill. *Id.* at 15.

Plaintiffs appended to their reply brief a summary judgment brief and an expert report filed by defendant in *Maco Bancorp, Inc. v. United States,* No. 94–625C (Fed.Cl., filed Sept. 23, 1994), and an expert report filed by defendant in *Republic Savings Bank v. United States,* No. 92–265C (Fed.Cl., filed Apr. 13, 1992). They contend that these filings show that "defendant has readily agreed both that *Winstar*-type contracts conveyed a valuable option to acquirers, and that damages for the breach of those contracts should be based upon the change in the value of the option." Pls.' Br. filed Apr. 11, 2003, at 16.

In *Maco* defendant's expert Robert E. Hall explained that a "payoff with the character of heads I win, tails I lose nothing is often called an *option.*" Expert Rpt. of Professor Robert E. Hall, Mar. 10, 1999, ¶ 41, filed in *Maco.* This concept is part of a "respected body of professional analysis and opinion among economists." *Id.* Defendant, in its summary judgment brief in *Maco,* argued that the value of the capital credit given to plaintiff had "the characteristics of an option contract" because of "the credit's capacity to enable the institution to stay in business beyond the period it could without the credit." Def.'s Br. filed Aug. 16, 1999, at 12, filed in *Maco.* Defendant's expert testimony in *Republic* echoed this characterization of government assistance when it argued that plaintiffs "received a valuable option through their ownership of [the failed thrift]." Expert Rpt. of Professor Alan C. Shapiro, Apr. 5, 2000, ¶ 54, filed in *Republic.* This was so because, while paying minimal equity for the thrift, "plaintiffs were able to use depositors' funds to acquire assets and finance risky investments without the need to put up additional capital of their own." *Id.* ¶ 55.

Defendant and its experts in *Maco* also assessed the propriety of a multi-path simulation model, such as the one sponsored by Dr. Kormendi in the case at bar. In defendant's brief in *Maco,* Professor Hall's testi-

mony was characterized as faulting plaintiff's lost profits model for "employing one possible outcome rather than considering the probability of multiple outcomes." Def.'s Br. filed Aug, 16, 1999, at 3, filed in *Maco*. Professor Hall also argued in *Maco* that lost profits must be calculated *ex ante* because lost profits are "inherently not foreseeable" because they "depend upon random events occurring between the date of the breach and trial." *Id.* Thus, plaintiffs argue that the Monte Carlo model corrects for the deficiencies that defendant criticized in *Maco*.

Defendant in the case at bar concedes that the put option theory has been "recognized in the literature and by our experts in a number of cases." Def.'s Br. filed May 12, 2003, at 9. However, it contends that this theory, and the Monte Carlo method of measuring damages, are "irrelevant" to the facts because of First Federal's capital position after FIRREA's enactment. *Id.* It further asserts that the Monte Carlo model assumes "that this put option value of insurance is zero for First Federal" in both the real and the but-for worlds, thereby rendering moot the parties' arguments regarding whether the Monte Carlo model actually measures the put option's value. Tr. at 35.

To bolster its arguments, defense counsel during oral argument mounted an opaque presentation, complete with slides and videotape. This demonstration only underscored the material dispute regarding the viability of the Monte Carlo model and what it measures and amounts to a request that the court weigh evidence—verboten on summary judgment. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The materials from *Maco* and *Republic* show that the put option theory can be advanced, but that plaintiffs in the case at bar have not done so with the same

level of detail presented by defendant and its experts in previous *Winstar* litigation.[12] However, while plaintiffs have presented sufficient evidence to require a trial on the Monte Carlo model and what it measures, they may adduce evidence at trial only that is consistent with Dr. Kormendi's written report. *See infra* IV.

In addition to the parties' dispute concerning the put option value of deposit insurance, the data on which Dr. Kormendi predicates his analysis renders his model less speculative than the lost profits models rejected both here and in *Fifth Third*. Dr. Kormendi states that he considered, when quantifying the expectations inherent in the Monte Carlo model, a "large number of factors that could affect the financial performance of any thrift," including "thrift-specific conditions (*e.g.*, the asset portfolio, the asset-liability structure, costs, management capability, and strategic choices such as plans to grow)." Kormendi Rpt. ¶ 34. He further described several factors which shaped the paths projected by the Monte Carlo model, including First Federal's financial statements, contemporaneous business plans, and operating results; data presented in memoranda describing First Federal's securities; retrospective data published by the Government; and the contemporaneous financial performance of thrifts located in First Federal's geographic market. *Id.* ¶¶ 39–41.

Dr. Kormendi's Monte Carlo model is not deficient as a matter of fact or law. Accordingly, defendant's motion for summary judgment as to the Monte Carlo model is denied.

### 3) *Calculation of cost of replacement capital*

■ Dr. Kormendi offers an alternative expectancy damages theory, one that pur-

---

12. Dr. Kormendi testified about a Monte Carlo model in another *Winstar* case pending in this court. *See Southern California Fed. Sav. and Loan Assoc. v. United States*, No. 93–52C (Fed. Cl., filed Jan. 28, 1993) ("*SoCal*"). The expert report submitted in *SoCal*, insofar as it presents a Monte Carlo model designed to measure a reduction in value of a business opportunity and a replacement capital calculation, is identical in all material respects to the report submitted in this case. *See* Tr. at 81 (plaintiffs' counsel admits that the reports provide "a very similar analysis"). During trial in June and July 2002, defense counsel in *SoCal*—who serves as defense

co-counsel in the case at bar—questioned Dr. Kormendi on both of his damages models, specifically addressing the subsidized deposit insurance received from the Government, and elicited testimony about whether Dr. Kormendi's calculations measured either the value of this insurance or the value to the thrift of exercising the put option characteristic of this insurance. *See, e.g.,* Transcript of Proceedings, *Southern California Fed. Sav. and Loan Assoc. v. United States*, No. 93–52C, at 2517–23 (Fed. Cl. June 25, 2002). *SoCal* remains *sub judice* as of the date of this opinion, and the trial in this case will benefit from the *SoCal* opinion.

ports to measure First Federal's costs if it had chosen to replace the goodwill eliminated by FIRREA with tangible capital. Kormendi Rpt. ¶ 80. This replacement capital calculation forecasted a but-for world where First Federal issued preferred stock annually between 1990 and 1995 in an amount corresponding to the goodwill phased out by FIRREA. *Id.* ¶ 84(a). These shares would be redeemable in annual amounts pursuant to the amortization schedule for the goodwill, *id.* ¶ 84(b), and an annual dividend of 12 percent would be issued to the stockholders "to attract sufficient interest among investors to place the entire issuance each year," *id.* ¶ 84(d). First Federal then would invest the raised capital in securities yielding the risk-free Treasury rate of return. *Id.* ¶ 84(e).

To determine the cost of replacing the goodwill, Dr. Kormendi totaled the costs of the equity issuances (transaction costs plus dividend pay-outs) minus the gains made in the Treasury securities. Kormendi Rpt. ¶ 84(g). After discounting to the date of the alleged breach, Dr. Kormendi opined that the cost of replacement capital equaled a minimum of $22.1 million. *Id.* ¶ 86.

Defendant argues that Dr. Kormendi's replacement capital theory is speculative and thus contrary to "bedrock corporate finance principles," First Federal's actual experience post-FIRREA, and Federal Circuit and Court of Federal Claims decisions on this theory of damages. Def.'s Br. filed Jan. 24, 2003, at 41. Plaintiffs counter that, once again, *Fifth Third* is contrary to Court of Claims decisions which recognize hypothetical replacement capital models as appropriate measures of damages.

The Federal Circuit has endorsed the use of a replacement capital calculation, recognizing that it " 'can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill.' " *LaSalle Talman,* 317 F.3d at 1374 (quoting *LaSalle Talman Bank, FSB v. United States,* 45 Fed.Cl. 64, 103 (1999), *aff'd in part, vacated in part, and remanded,* 317 F.3d 1363 (Fed.Cir.2003)). Plaintiff thrift in

*LaSalle Talman* recapitalized through an infusion of $300 million from "a merger partner," 45 Fed.Cl. at 103, but its expert premised a replacement capital calculation on the same theory presented by Dr. Kormendi in the case at bar: the costs incurred by the thrift in a theoretical issuance of preferred stock. Labeling this model "purely hypothetical," the trial court rejected plaintiff's replacement capital claim because "the record shows the actual method of mitigation chosen by [plaintiff]." *Id.* Although the Federal Circuit remanded as to the issue of replacement capital damages, it endorsed the trial court's refusal to credit a model that did not "reflect the·actual experience" of how plaintiff mitigated the effects of the breach. 317 F.3d at 1375.

The grant of summary judgment in *Fifth Third* as to plaintiff's replacement capital analysis is said to be contrary to *Alabama Shirt & Trouser Co. v. United States,* 121 Ct.Cl. 313, 1952 WL 5924 (1952), and *Rumley v. United States,* 152 Ct.Cl. 166, 285 F.2d 773 (1961). In both cases the Court of Claims was able to determine a reasonable cost of mitigation by reference to an existing market for the product in question. These cases do not "endorse hypothetical calculations of damages" like that presented by Dr. Kormendi. *See* Pls.' Br. filed Feb. 25, 2003, at 36 n. 43.

Plaintiffs' more viable argument contends that *Fifth Third* is distinguishable on its facts. On December 15, 1993, First Federal completed its conversion from a mutual to an equity institution, and on January 28, 1994, First Federal merged into Southern National, a commercial bank. Dr. Kormendi's calculation assumes that First Federal would issue preferred stock annually from 1990 to 1995. Thus, unlike in *Fifth Third,* First Federal, before its 1994 merger, could have engaged in an annual equity offering.

Additionally, perhaps realizing the futility of presenting a purely hypothetical model as a measure of damages, plaintiffs argue that Dr. Kormendi's calculation of the cost of replacement capital "measured an actual cost that [First Federal] incurred—the diminution in value of its deposit insurance." Pls.' Br. filed Apr. 11, 2003, at 27. Citing a March

29, 1991 study by the U.S. Securities and Exchange Commission (the "SEC") entitled "Estimating the Value of Federal Deposit Insurance," plaintiffs claim that Dr. Kormendi's model "is materially identical to the SEC-endorsed methodology" for calculating the value of deposit insurance.[13] *Id.* at 26. Defendant protested vehemently during oral argument that Dr. Kormendi did not testify during deposition that his replacement capital calculation measures the value of deposit insurance and accused plaintiffs of trying to salvage a damages theory that is doomed under binding authority.

The court concludes that plaintiffs have discharged their burden to prevent summary judgment from entering on their claim for the cost of replacement capital. As with Dr. Kormendi's Monte Carlo model, plaintiffs have characterized Dr. Kormendi's calculation as sufficiently distinct from other replacement capital models rejected by the Federal Circuit. However, the same restriction holds true for both Dr. Kormendi's replacement capital theory and his Monte Carlo model: Dr. Kormendi may testify to, and plaintiffs are free to adduce evidence that is consistent with, what has been presented in Dr. Kormendi's expert report. The court will not entertain theories or evidence that Dr. Kormendi has not placed on record.

Accordingly, defendant's motion for summary judgment as to Dr. Kormendi's calculation of the cost of replacement capital is denied.

### III. *Plaintiffs' cross-motion for partial summary judgment*

Plaintiffs have cross-moved for summary judgment on two issues: 1) that they are entitled to reliance damages in the amount of $22.4 million; and 2) that their expectation damages are not limited to $444,000.00, *i.e.,* defendant's estimate of the transaction costs that First Federal would have incurred in raising capital to replace the supervisory

goodwill. The court has determined that defendant is entitled to summary judgment on plaintiffs' reliance claims with the exception of two of the wounded bank costs. Thus, plaintiffs' motion for summary judgment as to their reliance damages is denied, as plaintiffs' surviving wounded bank claims total less than $22.4 million.

As to plaintiffs' expectation damages, the court has determined that Mr. Stokes's lost profits analysis is deficient as a matter of law. Dr. Kormendi's analyses as to lost value and replacement capital are reserved for trial. Plaintiffs, however, seek a ruling that their expectation damages may exceed the transaction costs—estimated by defendant to total $444,000.00, at maximum—that First Federal would have incurred in raising tangible capital to replace the supervisory goodwill eliminated by FIRREA. The court denies plaintiffs' motion, insofar as it places a number—which neither party has proved on summary judgment—on plaintiffs' recoverable expectation damages. The Federal Circuit has allowed a calculation of cost of replacement capital to serve as a viable measure of damages if it measures the actual costs that a plaintiff incurred in replacing the lost goodwill. *See, e.g., CalFed,* 245 F.3d at 1350. If First Federal incurred any costs to replace this lost asset, plaintiffs may offer proof at trial.

The court takes this opportunity to disabuse plaintiffs of the merits of one of their arguments: that defendant, not First Federal, had the primary duty to mitigate the consequences wrought by FIRREA, as defendant "was in the better position to mitigate the harm." Pls.' Br. filed Feb. 25, 2003, at 48. Plaintiffs' argument is contrary to black-letter law as to the duty of mitigation, the experience of numerous thrifts that scrambled to raise replacement capital after the passage of FIRREA, and Federal Circuit jurisprudence affirming the award of flota-

---

**13.** Defendant has filed a motion *in limine,* discussed *infra* IV, in which it asks the court not to consider Dr. Kormendi's supplemental declaration (which impacts only his replacement capital analysis) and several government studies cited by plaintiffs. *See* Def.'s Br. filed May 12, 2003, at 35. The supplemental affidavit attempts to

outline the parallels between one of the methodologies used in the 1991 SEC study and Dr. Kormendi's replacement capital calculation. As explained more fully *infra* IV, the court has not relied on either the supplemental declaration or the government publications in ruling on the dispositive damages motions.

tion costs to these thrifts. *See, e.g., CalFed,* 245 F.3d at 1350.

Accordingly, plaintiffs' cross-motion for summary judgment is denied.

## IV. *Defendant's motion in limine*

Defendant has moved to exclude a supplemental declaration offered by plaintiffs' expert Dr. Kormendi, as well as several government studies promulgated during the savings and loan crisis and FIRREA's implementation. Defendant deems these documents "a backdoor effort to introduce additional expert analysis." Def.'s Br. filed May 12, 2003, at 34.

### 1. *Dr. Kormendi's supplemental declaration*

Plaintiffs submitted a supplemental declaration from Dr. Kormendi, dated April 9, 2003, as an exhibit to their cross-motion for summary judgment. Defendant has requested that the court "not consider Dr. Kormendi's affidavit on the plaintiffs' hypothetical cost of replacement claim," which the court construes as a motion implicating only the court's decision on summary judgment. Def.'s Br. filed May 12, 2003, at 28.

Defendant argues that Dr. Kormendi's declaration is untimely and the court therefore should exclude it from consideration. Plaintiffs contend that Dr. Kormendi's declaration does not constitute an amendment to his report, and, even if it did, the declaration is premised on a document not produced by defendant during discovery.

RCFC 37(c)(1) provides, in pertinent part: "A party that without substantial justification fails ... to amend a prior response to discovery as required by RCFC 26(e)(2),[14] is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Under authority of this rule, a trial court may exclude untimely amendments to an expert report, even those premised on information previously disclosed. *See Finley v. Marathon Oil Co.,* 75 F.3d 1225,

1230–31 (7th Cir.1996) (discussing trial court's authority to exclude under Fed. R.Civ.P. 37(c)(1)).

In addition to its authority under Rule 37(c), the court made clear in the case at bar that it would not entertain amendments to expert materials during the motions practice on damages. During the status conference held December 13, 2002, defense counsel raised the possibility that plaintiffs might amend their expert reports, even though discovery was closed before the case was transferred from Judge Wilson's docket. *See* Transcript of Proceedings, *Southern Nat'l Corp. v. United States,* No. 95–526C, at 17 (Fed.Cl. Dec. 13, 2002). The court responded that it would be unfair to entertain any amendments to expert reports in opposition to a motion for summary judgment. *See id.* Plaintiffs indicated that, were the Federal Circuit to issue "a template for resolving the *Winstar*-related cases in bulk," plaintiffs would "want to have the opportunity to amend [their experts'] analysis to adopt such a theory." *Id.* The court clarified that either party would have the right to "bring to the Court's attention any circumstances that have changed sufficiently [to] warrant leave to amend the reports," but that, absent such a clarification, the court would not entertain amendments to the expert theories on record. *Id.* at 18.

Dr. Kormendi's declaration addresses "the relationship between the SEC's Yield Spread Analysis and [his] Cost of Replacement Capital analysis." Decl. of Roger C. Kormendi, Apr. 9, 2003, ¶ 5. The yield spread analysis is explained in the 1991 report from the SEC entitled "Estimating the Value of Federal Deposit Insurance," which plaintiffs charge defendant with failing to produce. In his declaration Dr. Kormendi reiterates that his analysis purported to calculate "the cost an institution would have incurred in replacing the lost supervisory goodwill." *Id.* ¶ 6. The SEC yield spread analysis was designed to "calculate the value of deposit insurance to a thrift." *Id.* ¶ 11. Dr. Kormendi posits that both calculations are from the "same family

---

**14.** This rule requires a party seasonably to amend a prior discovery response if the response is materially incorrect or incomplete, or if the

additional information has otherwise not been made known to the opposing party.

of formulae" that are "intended to achieve the same purpose—calculating the harm caused by the government's breach." *Id.* ¶ 6. Plaintiffs disclaim that Dr. Kormendi has presented new material in the declaration; instead, he "demonstrates the consistency" between the opinions previously set forth in his declaration and the SEC analysis. Pls.' Br. filed May 20, 2003, at 2.

Plaintiffs have presented a plausible argument that Dr. Kormendi's declaration does not constitute an untimely amendment. Because Dr. Kormendi's replacement capital theory will be a subject of trial, the prudent course is to grant defendant's motion *in limine*, but only insofar as it requests that the court not consider the impact of the declaration in ruling on the dispositive motions.[15] To the extent that defendant's motion *in limine* can be viewed as a motion to strike the declaration, however, the motion is denied without prejudice. Dr. Kormendi can testify at trial about the contents of his declaration; to the extent that defendant deems the declaration to present new material, it may renew this objection at trial.[16]

### 2. *Government studies and reports*

Defendant's motion *in limine* also covered "several Bank Board studies and articles, published in the early 1980s," that defendant accuses plaintiffs of proffering "in an effort to change their damages theories in violation of the Court's pre-summary judgment" ruling on amendments to expert reports. Def.'s Br. filed May 12, 2003, at 35. As with Dr. Kormendi's supplemental declaration, the court has not considered these documents, nor plaintiffs' justifications for proffering them. Defendant may raise its objection at trial that the documents constitute an attempt by plaintiffs to alter Dr. Kormendi's expert report.

Accordingly, defendant's motion *in limine* is granted as to both Dr. Kormendi's supplemental declaration and the disputed governmental studies and articles, insofar as the court did not consider these documents in

addressing plaintiffs' damages theories. It is denied without prejudice, insofar as defendant may argue at trial that these documents constitute untimely amendments to the expert reports on record at the close of discovery.

### V. *Plaintiffs' motion in limine*

Plaintiffs have moved to exclude certain documents submitted by defendant in support of its motion for summary judgment, contending that these documents are hearsay. Specifically, plaintiffs seek to exclude the following: 1) an August 24, 1988 article by Paul M. Horvitz entitled "The Increase in Capital Standards Will Make Banking Safer," which appeared *American Banker;* 2) all trial testimony from witnesses other than Dr. Kormendi in *SoCal*; and 3) certain "event studies" presented in other *Winstar* litigation which allegedly show that some thrift institutions benefitted from FIRREA's tightened regulatory capital requirements.

The court previously denied plaintiffs' motion as to the article by Dr. Horvitz. *See* Order entered May 22, 2003. As to the remaining two categories, the only trial testimony from *SoCal* presented by defendant in its dispositive motions, aside from Dr. Kormendi's, was that of its own expert, Dr. Shapiro. *See* Def.'s Br. filed May 28, 2003, at 1–2. The court has considered neither this testimony nor the event studies in ruling on the cross-motions on damages; moreover, defendant presents the plausible argument that the event studies are not hearsay, as they are offered not for the truth, but, rather, to show that economists have reached different conclusions regarding the impact of FIRREA on thrifts' stock prices.

Hearsay objections are amenable to rulings during trial, when the court may appreciate more fully the context in which the disputed testimony and documents are offered. Accordingly, plaintiffs' motion *in limine* as to Dr. Shapiro's testimony in *SoCal*

---

15.  *See supra* note 13.

16.  The court need not address plaintiffs' alternative argument that Dr. Kormendi's declaration, if found to contain new material, "was made nec-

essary by defendant's failure to produce the underlying SEC report during discovery." Pls.' Br. filed May 20, 2003, at 4.

and the event studies is denied without prejudice.

### CONCLUSION

Accordingly, based on the forgoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for summary judgment is granted with respect to Mr. Stokes's reliance calculation, lost profits model, and wounded bank claims for increased deposit costs and compensation for management time.

2. Defendant's motion for summary judgment is denied with respect to Dr. Kormendi's Monte Carlo model for measuring lost value and his analysis of the cost of replacement capital and with respect to Mr. Stokes's wounded bank claims for loan securitization costs and losses generated by the forced sale of real estate.

3. Plaintiffs' cross-motion for partial summary judgment is denied.

4. Defendant's motion *in limine* is granted in part, insofar as the court did not consider the disputed items when ruling on the cross-motions. Defendant's motion *in limine* is denied in part without prejudice to renewal at trial, insofar as defendant may object at trial that the documents constitute unseasonable amendments to plaintiffs' expert reports.

5. Plaintiffs' motion *in limine* is denied without prejudice to renewal at trial.